UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard Lee FREIE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Randolph JOUBIN aka Thomas
McLaughlin, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ramesh GANGADEAN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard Edward GORMAN,
Defendant-Appellant.

Nos. 75–3719, 75–3736, 75–3798
and 75–3799.

United States Court of Appeals,
Ninth Circuit.

Nov. 11, 1976.

Rehearing Denied Dec. 10, 1976.

Stephen H. Scott (argued), Scott & Novak, Phoenix, Ariz., for defendant-appellant in 75–3719.

Brice E. Buehler, Phoenix, Ariz., for defendant-appellant in 75–3736.

Craig Mehrens (argued), Mehrens & Pearce, Phoenix, Ariz., for defendant-appellant in 75–3798.

Ron Minkin, Los Angeles, Cal., for defendant-appellant in 75–3799.

Daniel R. Drake, Asst. U.S. Atty. (argued), Phoenix, Ariz., for plaintiff-appellee.

Before ELY and GOODWIN, Circuit Judges, and THOMPSON,* District Judge.

PER CURIAM.

FACTS:

Appellants, Freie, McLaughlin (later identified as Joubin), Gangadean, and Gorman, along with co-defendant Schatzberg, were indicted for conspiracy to possess marijuana with intent to distribute. 21 U.S.C. § 841(a)(1) and (b). Freie, McLaughlin (Joubin), Gangadean, and Gorman were convicted on that count and appeal. Schatzberg was acquitted. McLaughlin (Joubin) alone was also indicted for assaulting a federal officer with a dangerous weapon, 18 U.S.C. §§ 111 and 1114, and he appeals his conviction on that count.

* Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

On May 27, 1975, at about 6:30 a.m., Forest Service personnel observed a blue and white airplane circle the small airstrip at Young, Arizona, land, and taxi down to the east end of the runway to a point at which there were no facilities for tying the plane down. Two individuals were observed to be in the plane. At 8:15 a.m., another Forest Service officer observed the plane at the same place. No persons were in the plane at that time. At 11:00 a.m., upon returning to the airstrip, the Forest Service personnel went over to the plane and observed several cardboard boxes therein.

Customs officials were notified, and at about 1:45 p.m. Customs Officer Redden met with the Forest Service people at the airstrip, discovering that the airplane had departed. About 100 feet from the airstrip and visible therefrom was a neat stack of cardboard boxes covered by a tarpaulin. The boxes were across a cattle fence on property leased for private use. Redden opened one of the boxes and discovered marijuana.

The airstrip is in an isolated mountainous area, and is used by three to four aircraft per month. Vehicle access is via a dirt road which leads from the airstrip to route 200, which is also a narrow gravel or dirt road. About one mile easterly of this intersection route 200 intersects with route 288. Route 200 goes about seven miles in the opposite direction to a recreation area. Although it would not be unusual for recreation vehicles to be traveling on the roads on the Tuesday following the Memorial Day weekend, it is reasonable to infer that such vehicles remaining in or near the area would be primarily interested in the airstrip.

DEA agents were notified and thereafter both air and ground surveillance was conducted on the marijuana stash.

Redden and two other Customs agents left the airstrip at 10:45 p.m. to obtain some warm clothing in town. As they traveled west on route 200, before reaching route 288, Redden observed two pickup trucks with white campers traveling east in the direction of the airstrip. One of the pick-ups was described as maroon or brown, and the other was blue with a license number of NE 2597. Redden radioed this information back to the DEA agents back at the stash. Redden waited 20 to 30 minutes, but the vehicles did not return. At 11:20, DEA agent Valentine and others conducting surveillance of the marijuana stash heard whispered voices and observed two figures on or near the airstrip, but they were unable to make out what was said.

At 11:30 Redden and his companions drove back down route 200 toward the airstrip and contacted DEA agent Valentine by radio. Valentine told them that they had witnessed some activity and that Redden should set up surveillance back at the intersection of 200 and 288. After making a U-turn on 200, Redden observed two campers parked along that road in such a way that they would not have been detected as the agents came in. One of the vehicles appeared to be the same blue and white truck that had been previously observed coming into the area at 10:45. Redden could not testify as to whether the other vehicle was the same one they had seen previously. Redden and the other agents then set up their surveillance at the intersection of 200 and 288.

Back at the airstrip at 1:15 a.m., two Caucasian males, one of whom was blond and had a "high forehead", approached the agents' vehicle carrying guns. They apparently thought that the agents were smugglers because one said to the other that they should forget about the agents' "load" and take care of their own. At 2:00 a.m., two figures carrying guns moved into a prone shooting position behind a nearby tree, about 200 feet from the stash. The agents waited for a time, and ultimately turned a high powered flashlight on the two figures. The agents did not see the figures clearly enough to identify them, but they did note that they were Caucasian males. When the light was switched on, somebody shouted from the position of these two people, "Cut that off or you're dead." A minute or so later, the two men started firing at the agents. The agents identified them-

selves by shouting "Federal agents" and "Police", but the men continued to fire. The agents then returned the fire. After a few seconds, the agents ceased firing, and when there was no response to their demands for surrender, they conducted a search of the area. Appellant McLaughlin (Joubin) was found wounded and unconscious clutching an AR15. One of the agents said that he thought that the other person, who escaped, was using an automatic pistol, though no shell casings for such a weapon were found in the area.

In the meantime, Redden and the other Customs agents heard the shooting and began driving down 200 toward the airstrip. As they approached the intersection of 200 and the road to the airstrip, they noticed a cloud of dust as if a vehicle had just driven across the road. Across the road in the brush, Redden observed his headlights reflecting off of what appeared to be a windshield.

After giving first aid to McLaughlin, DEA agent Valentine drove into town at about 3:00 a.m. to get a nurse. As he drove out the airstrip road onto 200, he observed a reflection across the road that appeared to be one or more vehicles. Upon returning with the nurse at 4:00 a.m.; Valentine again observed the same reflections he had seen before. At 4:10 a.m., surveillance aircraft observed a camper heading northeast on 288, away from the area. Because of a mixup, the air surveillance was ordered to cease surveillance of the first vehicle, but about 10 minutes later a second camper was spotted. This second vehicle had apparently been traveling without its lights because the pilot testified that its lights just all of a sudden appeared. At first the vehicle was heading south, but then it made a U-turn and proceeded in the same direction as the first vehicle, toward the intersection of route 288 and highway 260. Air surveillance was continued until the vehicle arrived at a roadblock set up at that intersection. At 4:25 a.m., Agent Valentine and two others left the airstrip and observed that the vehicles they had seen at the airstrip road intersection were no longer there.

They stopped to investigate the area and discovered unusually large tire tracks. They also discovered a letter on the ground addressed to Jose Alonso, with a copy indicated to Mrs. Vicki Chapman. The name "Chapman" meant something to the agents because Mr. Anton Chapman was an alleged marijuana smuggler.

The blue and white camper was stopped at the roadblock and Gorman and Gangadean were ordered out of the truck at shotgun point. They were advised of their rights and detained until DEA agents could arrive. Valentine and two others arrived at the roadblock at about 5:50 a.m. After advising the two suspects of their rights, the agents asked them where they had been. They responded that they had been to Roosevelt Lake and were proceeding to Show Low. One of them said that they had made no stops and the other said that they had only stopped to urinate. Gorman did not at first give his correct name. Valentine then approached the vehicle and noticed an envelope sitting face up on the dashboard in plain view. The envelope was addressed to Mrs. Vicki Chapman, and it had the same return address as was on the letter they had previously found. Gorman and Gangadean were then formally placed under arrest. The blue camper had license number NE 2697, one digit off from the number observed by Redden earlier.

In the meantime, a bulletin was sent out for police to watch for a brown or maroon pickup with a white camper shell, having wide tires. At about 7:00 a.m., a deputy sheriff spotted such a vehicle at a summer resort lodge called "Kohl's Ranch" on highway 260. The truck was dusty as if it had been on the back roads. The officer checked the doors to the cab and found that they were locked. He called in the license plate number and found that it was registered to co-defendant Schatzberg, who at that time was unknown to the deputy. He went into the lodge and found that nobody registered at the lodge had indicated that the truck belonged to him. The deputy then walked to the back of the camper and opened the door to discover appellant Freie

sleeping inside. Freie did not give his correct name upon questioning by the officer. The officer then asked him, whether he could look through the camper, and Freie replied "yes." The officer then asked whether he could look in the cab of the truck and Freie replied "yes" and unlocked the front door for the officer. Under a sweater on the front seat the officer found a 9 millimeter automatic pistol. It appeared to the officer that the weapon had been fired recently. Freie was then placed under arrest. Freie had blond hair and a high forehead, but the agents at the shootout scene could not positively identify him as the man who had been at the airstrip that night.

At trial Carlton Wilbar, manager of the gun department in a Phoenix department store, was called to testify for the prosecution. Although Wilbar had not actually sold the AR15 held by Joubin after the shootout, he was present at the time that it was sold, and as custodian of records he was called to authenticate the store's record of the sale. The record disclosed that the weapon had been sold to Gangadean, and it gave his height and weight and the information that Gangadean was of East Indian descent. When Wilbar began to testify as to the contents of the document, counsel for Gangadean objected. The prosecutor explained that his next witness would be the salesperson who had actually filled out the form, but he asked Wilbar to identify the purchaser of the weapon based upon his first-hand knowledge. Wilbar identified Gangadean in court as the purchaser of the weapon. On cross-examination it was revealed that Wilbar had read the record of the purchase before trial and that just before the trial began he was asked by the prosecution whether he could identify from the people in the courtroom the purchaser of the gun. Wilbar identified Gangadean, who was the only person with a dark complexion in the room. Wilbar testified that essentially the same people were present in the courtroom when he made the pre-trial identification as when he made the in-court identification.

ISSUES:

1. Appellants Gangadean, Gorman, Freie and Joubin all contend that the evidence was insufficient to sustain a verdict of guilty with respect to the charge of conspiracy to possess marijuana with intent to distribute.

2. Appellants Gangadean and Gorman contend that the trial court erred in finding that they had no reasonable expectation of privacy with respect to the stack of closed cardboard boxes located on private land.

3. Appellant Joubin contends that the evidence was insufficient to sustain a verdict of guilty with respect to the charge of assaulting a federal officer with a deadly weapon.

4. Appellant Joubin contends that the trial court erred when it increased his bail without notice and without the opportunity to be heard.

5. Appellant Freie contends that the initial search of the camper in which he was found sleeping was an illegal search and, therefore, the trial court erred in declining to suppress the evidence seized.

6. Appellant Gangadean contends that the agent lacked probable cause to arrest him.

7. Appellant Gangadean contends that the trial court erred in declining to strike a witness's in-court identification of him as the purchaser of the automatic weapon.

The evidence establishing the existence of a conspiracy to possess marijuana with intent to distribute involving two or more persons is overwhelming. The only arguable issue is whether the evidence is legally insufficient to sustain a finding that each of the appellants was a member of the conspiracy.

Once the existence of a conspiracy is established only slight evidence is required to connect any given defendant with it. *U. S. v. Westover,* 511 F.2d 1154 (9 Cir. 1975); *U. S. v. See,* 505 F.2d 845 (9 Cir. 1974). On appeal the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the

government. *Glasser v. U. S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Of course, the "slight" evidence must be of the quality which will reasonably support a conclusion that the particular defendant in question wilfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy. A common purpose and plan need not be proved by direct evidence but may be inferred from a "development and collocation of circumstances", *Glasser v. U. S., supra.*

■ The evidence connecting Joubin to the conspiracy is the strongest. He was found unconscious near the marijuana cache clutching a rifle purchased by appellant Gangadean. Further, before the shoot-out, two individuals were seen near the marijuana cache and were heard talking about their "load." While it was not clearly established that one of those individuals was appellant Joubin, one of them did carry a rifle. The shoot-out itself, prompted only by the shining of a flashlight, is strong evidence of guilty knowledge and intent.

The evidence against appellant Gangadean also is sufficient. He was the purchaser of the rifle used by appellant Joubin at the scene of the marijuana cache. Further, the envelope found in the vehicle in which he was a passenger could be connected with a letter found near the airstrip. There is evidence indicating that the envelope and letter might have significance other than that relating to the location at which the letter was found. A "Mr. Chapman" had a long history of involvement in drug smuggling activities in the area.

Both Gorman and Gangadean were arrested in the blue and white camper, which had been identified as traveling toward the airstrip at 10:45 p. m. and which was stopped leaving the area some six hours later. No reasonable explanation of their presence was given. The camper was an appropriate vehicle for the recovery of the marijuana stash. Gorman was an active participant with Gangadean, whose purchase of the rifle used by Joubin clearly reflects their criminal connection. Gorman was the driver of the blue and white camp-

er and it can be inferred that Gorman's driving was an overt act in furtherance of the conspiracy. While presence or casual driving alone may not be sufficient, here the evidence showed that Gorman was doing something in the area for the better part of the night.

The evidence with respect to Freie is less adequate. He was found asleep in a dusty camper in the parking lot of a lodge some forty miles from the airstrip. Nothing about the description of the camper adequately identified it as having been near the airstrip. According to the officer, he freely consented to a search of the vehicle, which may import absence of guilty knowledge. The automatic pistol found in the cab of the pick-up could not be identified as a weapon used at the shoot-out. In fact, evidence showed that when Gangadean bought the rifle, he also purchased an automatic pistol, which was not the one in Freie's possession. The fact that Freie has blond hair and a receding hairline are common characteristics and do not reasonably identify with the description of a man with light colored hair and a high forehead seen near the stash. While suspicion is strong, we are impelled to the conclusion that even under the slight evidence test the evidence against Freie does not adequately connect him with a conspiracy to possess the marijuana with intent to distribute as a wilful participant.

Under the first assignment of error, the convictions of Joubin, Gangadean and Gorman must be affirmed, and that of Freie must be reversed.

Joubin contends that the evidence against him on the assault charge is insufficient to convict because it did not demonstrate that he knew that he was firing on federal agents and it did not show that he was not acting in self-defense. This is frivolous.

■ First, to be convicted under 18 U.S.C. § 111, one need not know that the persons he is assaulting are federal officers; he need only intend to assault persons who turn out to be federal officers. *U. S. v. Feola,* 420 U.S. 671, 684, 95 S.Ct. 1255, 43

L.Ed.2d 541 (1975). Second, even if he did have to know they were federal officers, the court would have been justified in concluding that he fired on the agents after being informed by them that they were federal officers.

Finally, the contention that he was acting in self-defense is without merit in view of the fact that the only action prompting him to fire his weapon was the fact that a light was turned onto him.

■ Also, Joubin's contention of error with respect to the pretrial bail proceedings is not assignable to reverse a conviction. *Kaufman v. U. S.,* 325 F.2d 305 (1963).

Both Gangadean and Gorman assign as error the court's denial of the motion to suppress the search and seizure of the boxes of marijuana stashed on the other side of the fence near the parking spot of the airplane.

■ In *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the court held that the protection provided by the Fourth Amendment to the people to be free from unreasonable searches and seizures in their "persons, houses, papers and effects" is not extended to open fields. In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court held that the Fourth Amendment protects people, not "places." Ever since that decision, the determination of whether an intrusion is an unreasonable search has depended on one's actual subjective expectation of privacy and whether that expectation is objectively reasonable. See *Katz,* supra, at 361, 88 S.Ct. 507 (Harlan, J., concurring). Thus, the proper focus is no longer on common law property concepts. See *Wattenburg v. United States,* 388 F.2d 853, 857 (9 Cir. 1968). It now appears that *Hester* no longer has any independent meaning but merely indicates that open fields are not areas in which one traditionally might reasonably expect privacy. *United States v. Magana,* 512 F.2d 1169, 1170 (9 Cir. 1975); *Patler v. Slayton,* 503 F.2d 472, 478 (4 Cir. 1974).

*United States v. Pruitt,* 464 F.2d 494 (9 Cir. 1972), is factually similar to this case.

In that case, Customs officials received a tip that a large cache of marijuana had been smuggled into California. Later, law enforcement officers observed individuals remove two large boxes from a van and place them in an area covered with underbrush. During two searches of the area, the officers uncovered boxes and duffel bags containing marijuana.

The court held that the defendant-appellant did not have a reasonable expectation of privacy with respect to the marijuana cache. The court distinguished *Wattenburg* on the grounds that the outdoor area was not adjacent to a home and that any casual passer-by would have access to the cache and could attempt to ascertain what the boxes and duffel bags contained. See also *United States v. Capps,* 435 F.2d 637 (9 Cir. 1970).

■ Hence, while it is possible that appellants had actual subjective expectations of privacy, those expectations were not objectively reasonable and the motions to suppress were properly denied.

In view of our conclusion that the evidence received against Freie does not sustain the conviction, we do not reach his contention that his motion to suppress the evidence seized from the pick-up in which he was sleeping should have been granted because the officer's initial intrusion was unlawful and tainted the subsequent consent to the search.

There was ample probable cause for Gangadean's initial arrest. Gangadean's final argument is that a witness's in-court identification of him should have been excluded.

In order to establish that appellant Gangadean purchased the automatic rifle used by appellant Joubin in the shoot-out, the government called Carlton Wilbar, the manager of the gun department of the company from which the rifle was purchased. Mr. Wilbar identified Gangadean as the person who purchased the rifle. Immediately before trial, Wilbar had an opportunity to observe appellant Gangadean, the only person of Indian descent present in the courtroom at the time (Tr. I 341–343). Ap-

pellant contends that the opportunity to observe him was tantamount to a show-up, and that it unconstitutionally tainted the subsequent in-court identification.

*Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), is the most recent Supreme Court case considering the scope of due process protection against the admission of evidence derived from suggestive identification procedures. There, the court summarized the rule of law as it had evolved from previous decisions. The court concluded that the primary evil to be avoided is a "very substantial likelihood of irreparable misidentification." Id., at 198, 93 S.Ct. at 381, citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In an earlier case, *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the court had focused on the "suggestiveness of the confrontation procedures conducted by the police."

 Thus, the due process test emerging from *Biggers* is: (1) whether or not the confrontation procedures employed by the police were "suggestive"; and (2) if they were, based on the totality of the circumstances, what was the possibility that the eye witness would make an irreparable misidentification?

 Here, there was no evidence of improper conduct on the part of law enforcement officials or the United States Attorney which would support a conclusion that the confrontation between the eye witness and appellant Gangadean was impermissibly suggestive. This is not a situation in which law enforcement officials conducted a show-up. See *Neil v. Biggers,* at 195, 93 S.Ct. 375. Instead, this is a situation in which, by happenstance and the circumstances of trial, the eye witness confronted the defendant.

Obviously, since Gangadean was a defendant in the case, the inevitable suggestion was that the government believed he had committed the crime charged, but his presence implied nothing with respect to the purchase of a rifle, which was only circumstantially relevant. *Baker v. Hocker,* 496 F.2d 615, 617 (9 Cir. 1974), makes it clear that more than suggestion is required for a due process violation—the "procedure must create 'unnecessary' or 'impermissible' suggestion."

Under the totality of the circumstances, the identification procedure used created little likelihood of misidentification. The eye witness had almost thirty minutes in the store to observe appellant. He was certain of his identification even after extensive cross-examination. The confrontation occurred about six months later. Although Wilbar's prior description was general, it was consistent with appellant's features. Finally, the district judge, after observing appellant Gangadean, commented that appellant's features were so distinctive that it was entirely reasonable that someone, after having observed him for thirty minutes, would be able to remember him six months later.

The conviction of appellant Freie is reversed, and the convictions of appellants, Joubin, Gangadean and Gorman for conspiracy and of appellant Joubin for assault are affirmed.