UNITED STATES of America,
Plaintiff-Appellee,

v.

David T. LACE, Roger R. Ducharme, Gary
D. Butts, Patricia Eckman, and Glenn
Pollack, Defendants-Appellants.

Nos. 1560, 1561, 1563, 1562, 1542, Dockets
81–1098, 1099, 1102, 1100, 1103.

United States Court of Appeals,
Second Circuit.

Argued July 15, 1981.

Decided Jan. 5, 1982.

Clifford J. Steele, Atlanta, Ga., for appellant Lace.

Paul J. Cambria, Jr., Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Barbara Davies Eberl, Buffalo, N. Y., on the brief), for appellant Ducharme.

Robert G. Fierer, Atlanta, Ga., for appellant Butts.

Lewis K. Sussman, Burlington, Vt. (Agel, Carroll & Sussman, Burlington, Vt.) for appellant Pollack.

Ellen Mercer Fallon, Middlebury, Vt. (Langrock, Sperry, Parker & Stahl, Middlebury, Vt.), for appellant Eckman.

Peter W. Hall, Asst. U. S. Atty., Rutland, Vt. (Jerome F. O'Neill, U. S. Atty., D. Vermont, Jerome J. Niedermeier, Rutland, Vt., of counsel), for appellee.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and DUMBAULD,* District Judge.

VAN GRAAFEILAND, Circuit Judge:

On this appeal, we are confronted once again with a case in which every issue has been tried except that of guilt. On December 17, 1979, appellants were indicted for narcotics violations in the United States District Court for the District of Vermont. During the ensuing ten months, appellants presented Chief Judge Holden of the District Court of Vermont with more than eighty pre-trial motions. These were followed by a fourteen day hearing on appellants' combined motions to suppress. When these motions were denied in substantial part, *see United States v. Lace*, 502 F.Supp. 1021 (D.Vt.1980), each defendant pleaded guilty to one count of the indictment, reserving, pursuant to stipulation, his or her right to appeal the district court's suppression rulings. Appellants have now filed over 200 pages of briefs in our Court in which the word "innocent" is conspicuous only by its absence. Appellants' sole arguments for reversal are that the Government, in a variety of ways, violated their constitutional rights.[1] Finding no merit in these arguments, we affirm the judgments of conviction. Although we can add but little to Chief Judge Holden's thorough and scholarly opinion, some discussion may be appropriate in several areas where appel-

* Of the Western District of Pennsylvania, sitting by designation.

1. Appellant Pollack also asserts that his sentence was excessive, a contention which we find to be without merit.

lants strongly contend that error has occurred.

On May 15, 1979, Judge Charles Bristaw of the Vermont District Court issued a warrant authorizing a search for drugs in a house, a garage and a barn on Beaver Brook Road in the Town of Sharon, Vermont. The search authorized by this warrant uncovered, among other incriminating evidence, approximately 457 pounds of hashish and 100 pounds of marijuana. Because this evidence is the bedrock upon which the Government rests its case, appellants' attack has been centered mainly on the legality of the search.

The affidavits upon which the warrant was based were executed by two members of the Vermont State Police, Corporal Vallie and Trooper Holton. Corporal Vallie, a member of Vermont's Special Investigation Unit, with specialized training and education in the narcotics field, swore that the Special Investigation Unit had received information concerning a major drug distribution organization. This information led them to appellant Lace, the proprietor of a restaurant in Jamaica, Vermont, known as the Bailey-Rawston House. There, the troopers became acquainted with both Lace and appellant Ducharme.

On one of Vallie's visits to the Bailey-Rawston House, he was accompanied by a confidential informant who introduced him to David Southam. The informant told Vallie that Southam was Lace's right-hand man, and the informant believed Lace and Southam to be the suppliers of cocaine to a previously convicted buyer named Steele. On April 23, 1978, Lace, injured in an automobile accident, was found to have $6,000 in cash on his person, which he stated was the day's proceeds from his restaurant. At that time, however, the restaurant was closed for the season. Hospital personnel also heard Lace telephone a friend and instruct him to look under the car seat for additional money.

In March, 1979, Vallie received additional information from another unidentified informant. Vallie stated that the informant's information was reliable because it was self-incriminating and much of it had been substantiated by independent investigation. It was this informant's disclosures that led the police to appellants' drug "warehouse" on Beaver Brook Road. The informant told Vallie that he had been doing business with Lace and Ducharme since 1975, and that they appeared to have an equal interest in the drug business. The informant correctly described and located a house owned by Ducharme in Quechee, Vermont.

The informant stated that Lace and Ducharme had handled over 30,000 pounds of marijuana during 1975–76, and that during the ensuing four years they used various "stash houses" to warehouse the drugs. He described the location of the stash house then being used and stated that within the preceding three months he had purchased 500 pounds of marijuana at that location. The stash house thus described was the Beaver Brook Road property covered by the subsequently issued search warrant. The informant said that the stash house was run by Ducharme's cousin whose first name was "Gary" and who drove a dark color Ford pick-up truck with a cap. The informant stated that the narcotics group used several pick-up trucks with caps to deliver marijuana, which was normally packaged in fifty pound bales, and that each truck would carry about 1,000 pounds; that during 1978, the group purchased, warehoused, and distributed about 30,000 pounds of marijuana. The informant was told by Ducharme on February 29, 1979, that the group was trafficking heavily in cocaine on a year-round basis and that marijuana shipments for the 1979 season would begin in April.

The informant told Vallie that the Ducharme-Lace organization had "personally sold him multiple pounds of marijuana" since 1975; that the group was operating a multiple pound cocaine distribution scheme on a year-round basis, while the marijuana operation went from April through the summer. He provided Vallie with the telephone numbers and location of the 1979 warehouse on Beaver Brook Road.

■ This information, standing alone, provided sufficient probable cause to justify

a court-authorized search of the Beaver Brook Road buildings. *Mapp v. Warden, New York State Correctional Institution for Women,* 531 F.2d 1167, 1171–72 (2d Cir. 1976). "Although the informant did not have a previous track record of reliability, this is not the only means whereby an informant's trustworthiness can be established." *Id.* at 1171. The fact that the informant, himself, was a confessed participant in the criminal activities taking place on Beaver Brook Road was, by itself, sufficient to establish the trustworthiness of his disclosures. *United States v. Dunloy,* 584 F.2d 6, 10 (2d Cir. 1978); *United States v. Rueda,* 549 F.2d 865, 869 (2d Cir. 1977); *United States v. Burke,* 517 F.2d 377, 380 (2d Cir. 1975); *United States v. Miley,* 513 F.2d 1191, 1204 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975).

However, the Vermont police did not rest on this evidence alone; they gave Judge Bristaw additional facts to corroborate the informant's story. Vallie's affidavit states that during several random surveillances he and Trooper Holton saw a dark blue pick-up truck with a white cap at the Beaver Brook Road premises. The truck was owned by appellant Butts, whose first name is "Gary". On several occasions, vehicles owned by Lace, Ducharme and Southam were also seen at that address. Appellant Butts' truck was also seen at Ducharme's residence in Quechee, as was that of a known drug peddler. This combination of corroborating evidence and the informant's admitted participation in appellants' criminal activities was sufficient to satisfy a prudent judge such as Judge Bristaw that the informant's story was credible and that there was probable cause for a search warrant to be issued. *Mapp v. Warden, supra,* 531 F.2d at 1171; *United States v. Sultan,* 463 F.2d 1066, 1068–69 (2d Cir. 1972). This being so, appellants' argument that the affidavits submitted to Judge Bristaw referred to other evidence allegedly obtained in violation of appellants' constitutional rights is of little consequence.

The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.

*United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J. concurring and dissenting).

Justice Powell has summarized in the above quote what has been the established law of this Circuit for many years. *See, e.g., United States v. Vasquez,* 634 F.2d 41, 44–45 (2d Cir. 1980); *United States v. Jackstadt,* 617 F.2d 12, 14 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Marchand,* 564 F.2d 983, 991–94 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *Parts Mfg. Corp. v. Lynch,* 129 F.2d 841 (2d Cir.), *cert. denied,* 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942). Other Circuits are in accord. *See United States v. Williams,* 633 F.2d 742, 745 (8th Cir. 1980).

Examining the evidence of surveillance referred to in the troopers' affidavits and explored at length during the suppression hearings, we agree with the holdings of Chief Judge Holden concerning its admissibility on the trial. Judge Holden found that the Beaver Brook Road property consisted of the house, barn, and garage, and approximately 70 acres of land. It was owned jointly by two couples named Heine and Berkman. They rented the house and garage to Butts for his exclusive use for one year beginning September, 1978, with the understanding, however, that Butts would share the use of the remaining property with the owners. The owners could use the remainder of the property for recreation as they desired, and permission for such use had also been given to the neighbors. The property was not posted and was used freely by hunters. "Outsiders could enter the open property at will." 502 F.Supp. at 1038.

Although the yard, the garage, the barn, and much of the house were visible

from the public highway, a good deal of the police surveillance which occurred after April 24, 1979, took place on the property itself. On occasion, binoculars and a spotting scope were used. Other more sophisticated optical instruments were also tried but with little success.

Appellants contend that all observations made during such surveillance violated their constitutional right of privacy and must be suppressed. The district court agreed that, while appellants were inside the house, they had a legitimate expectation of privacy from telescopic observation. *See United States v. Taborda*, 635 F.2d 131, 136–38 (2d Cir. 1980). However, because the area between the house, the garage, and the barn was clearly visible from the road and could easily be observed by outsiders who "could enter the open property at will", the district court held that none of the appellants had a legitimate expectation of privacy while in that open area. We agree.

In *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924), Justice Holmes enunciated for the Court what has since become to be known as the "open fields" doctrine. There, two revenue officers were approaching a farmhouse in which the defendant lived, when they saw another person drive near the house. The officers concealed themselves from 50 to 100 yards away and saw the defendant come out of the house and hand the arrival a bottle which contained moonshine whiskey. The Court held that, even if the revenue officers were trespassers, there was no illegal search or seizure, stating that "the special prohibition accorded by the Fourth Amendment . . . is not extended to the open fields." *Id.* at 59, 44 S.Ct. at 446.

Although the emphasis on Fourth Amendment protections has shifted from

places to people, *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), the "open fields" doctrine continues to receive judicial recognition. This is because people generally do not have a legitimate expectation of privacy in open and accessible areas that the public is prepared to recognize as reasonable. *United States v. Freie*, 545 F.2d 1217, 1223 (9th Cir.), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1976). Thus, in *Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), the Court held that a state health inspector's warrantless entry onto defendant's outdoor premises to make an opacity test of smoke coming from the defendant's chimneys was not an unreasonable search. Justice Douglas, speaking for the Court said that the inspector was "well within the 'open fields' exception to the Fourth Amendment approved in *Hester*." *Id.* at 865, 94 S.Ct. at 2115.

In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the defendant, when first observed by the police, was standing in the doorway of a house. The police arrested her in the vestibule, to which she had retreated. The Court, distinguishing between private property under the common law and public places under the Fourth Amendment, held, citing *Hester*, that, when first seen, the defendant was "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42, 96 S.Ct. at 2409.

Chief Judge Holden's factual findings that outsiders could enter the Heine and Berkman property at will and that the area between the house and barn was readily observable from the highway were not clearly erroneous and must therefore be accepted by this Court.[2] What was observ-

---

**2.** Judge Newman states that when Chief Judge Holden found that "[o]utsiders could enter the open property at will", he was not referring to the public at large but only to a narrow segment. We disagree. Inasmuch as Chief Judge Holden relied upon the quoted finding in reaching a conclusion diametrically opposed to that of our colleague, we believe that Chief Judge

Holden meant exactly what he said, not what Judge Newman contends that he meant to say. The surveillance in question took place in April and early May, and the district court's finding would be pointless unless directed to that period. When the court found that "outsiders" could enter at will, it obviously was not refer-

able by the general public was observable without a warrant by the police as well. *Marshall v. Barlows, Inc.*, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978); *see United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973), (citing *United States v. Doe*, 457 F.2d 895, 898–99 (2d Cir. 1972), *cert. denied*, 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973)); *United States v. Miller*, 589 F.2d 1117, 1133–34 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Knight*, 451 F.2d 275, 278 (5th Cir. 1971), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972).

Among the lower court decisions adopting the Hester-Katz rationale, the following are illustrative:

*United States v. Varkonyi*, 645 F.2d 453 (5th Cir. 1981).

> View from roadway of illegal aliens working in delivery area of defendant's fenced scrap metal yard.

*Patterson v. National Transportation Safety Board*, 638 F.2d 144 (10th Cir. 1980).

> Examination of exterior of plane parked at private airport.

*United States v. Magana*, 512 F.2d 1169 (9th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975).

> View of defendant in front of garage from police car driven into private residential driveway.

*United States v. Hensel*, 509 F.Supp. 1376 (D.Me.1981).

> Surveillance of outdoor premises with a telescope, a spotting scope, binoculars, and a nightscope, plus aerial surveillance and physical entry onto driveway.

*See also United States v. Arboleda*, 633 F.2d 985, 991–92 (2d Cir. 1980); *United States v. Mullinex*, 508 F.Supp. 512 (E.D.Ky.1980); *United States v. DeBacker*, 493 F.Supp. 1078 (W.D.Mich.1980).

■ Although some of the observations of the outdoor area were made with binoculars or other visual aids, this did not make such observations unlawful. *United States v. Allen*, 633 F.2d 1282, 1290–91 (9th Cir. 1980); *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). In *United ed States v. Taborda, supra*, 635 F.2d 131, we held that the Fourth Amendment proscribed the use of a telescope by a policeman only so far as it enhanced his view into the interior of a home. *Id.* at 139. Its use is not proscribed in places where the defendant otherwise has exposed himself to public view. *United States v. Allen, supra*, 633 F.2d at 1289; *United States v. Hensel, supra*, 509 F.Supp. at 1384 n.9; *United States v. Bifield*, 498 F.Supp. 497, 506–08 (D.Conn.1980).

Judge Newman's reference to nude sunbathers is a felicitous one because it brings the issue of reasonable expectations of privacy into sharp focus. If one were asked whether a person, strolling stark naked around an open yard such as the one on Beaver Brook Road, reasonably could expect to do so in privacy, we suggest that the answer would have to be "No". If this is so, there is no reason why the judiciary should clothe similarly located drug traffickers in cloaks of invisibility.

■ The only other issue meriting comment involves the search of appellant Lace's automobile. The search warrant for the Beaver Brook Road premises was executed during the evening of May 16, 1980. While the search was in process, Lace arrived in his car with Ducharme as a passenger. Both were promptly arrested. Lace was given his *Miranda* warnings but made no request for an attorney at that time.

Sometime after midnight, both Lace and his automobile were taken to the Bethel Police Barracks. Around 4:00 a. m., the police asked Lace if he would permit them

---

ring to summertime swimmers or fall hunters. The district court said:

> The land was not posted. Outsiders could enter the open property at will. Therefore, Butts' actions outside the buildings could easily be observed by *any person* going on the land. (emphasis supplied)

We suggest that, as used by Chief Judge Holden, the phrases "any person" and "outsiders" are synonymous.

to search his car. The district court's findings relative to this conversation were as follows:

> Corporal LeClair referred to the lateness of the hour and pointed out that Lace's consent to a search would save a lot of time that would be required to obtain a search warrant. Lace replied he would be willing to permit a search on one condition—to the effect that whatever was found in the search of the vehicle, he (Lace) didn't know anything about.

Lace then executed a written consent which is set forth at full in the margin.[3] In the search that followed, the police found and seized $185,000.

Lace's contention that his consent was not voluntarily given was rejected by the district court, a factual finding which should not be overturned unless clearly erroneous. *United States v. Price*, 599 F.2d 494, 503–04 (2d Cir. 1979). The district court found Lace to be a "mature", "well informed", "enlightened" person with four years of college education, who was not under duress during his detention and who "conveyed the impression of being self-possessed and self-confident despite his predicament." The district court also found no persuasive evidence of police overbearing, deprivation of physical needs, or deception. Having seen and heard the witnesses, the district court was in a far better position to make these findings than is this Court.

The district court found that Lace's consent was not in response to police interrogation. It was instead a "practical accommodation to a consequence that the witness understood would be inevitable by way of a search warrant", and was accompanied by an imposed condition that the property uncovered would not be considered to be his. In the absence of any deception, coercion, or other overreaching on the part of the police. Lace's belief in the inevitability of a search warrant, a justifiable belief under the circumstances, did not preclude a finding that his consent was voluntary. *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979); *United States v. Tortorello*, 533 F.2d 809, 814 (2d Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *United States v. Miley*, 513 F.2d 1191, 1199 n.4 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975); *United States v. Faruolo*, 506 F.2d 490, 493–94 (2d Cir. 1974); *United States v. Curiale*, 414 F.2d 744, 746–47 (2d Cir.), *cert. denied*, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969); *United States v. Jordan*, 399 F.2d 610, 614 (2d Cir.), *cert. denied*, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); *United States v. Flores*, 462 F.Supp. 702, 708–10 (E.D.N.Y.1978), *aff'd sub nom. United States v. Vasquez*, 612 F.2d 1338, 1346–47 (2d Cir. 1979), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States v. Manarite*, 314 F.Supp. 607, 613 (S.D.N.Y.1970), *aff'd*, 448 F.2d 583 (2d Cir.), *cert. denied*, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971).[4]

The consent to a search by one who realizes that the jig is up and a search warrant will issue in any event is similar to a plea of guilty by one who believes that he will be

---

**3.** I, DAVID LACE, having been informed of my constitutional right not to have a search made of my premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search voluntarily authorize M. LeClair and N. Ruggiero, Officers of the Vermont State Police to conduct a complete search of my (car) located at Bethel, Vermont. These officers are authorized by me to take from my (car) any letters, papers, materials or other property which they desire in connection with a pending investigation being made by them. This written permission is being given by me to the above mentioned Officers voluntarily and without threats of promises of any king [sic].

**4.** Other Circuits are in accord. *See, e.g., United States v. Miller*, 589 F.2d 1117, 1132 n.13 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Agosto*, 502 F.2d 612, 614 (9th Cir. 1974); *United States v. Culp*, 472 F.2d 459, 461 (8th Cir.), *cert. denied*, 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973); *United States v. Savage*, 459 F.2d 60, 61 (5th Cir. 1972); *United States v. Myers*, 378 F.2d 398, 399 (3d Cir. 1967), *cert. denied*, 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96 (1969); *Robbins v. MacKenzie*, 364 F.2d 45, 50 (1st Cir.), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966); *Gatterdam v. United States*, 5 F.2d 673, 674 (6th Cir. 1925).

convicted if he stands trial. *Robbins v. MacKenzie, supra*, 364 F.2d at 50. His act does not become involuntary simply because the consequences would have been the same if he refused. *See United States v. Gorman*, 355 F.2d 151, 159 (2d Cir. 1965), *cert. denied*, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966). Like the defendant who pleads guilty, Lace was attempting to make the best deal he could under the circumstances.

A judge who accepts a guilty plea makes careful inquiry to ascertain that the plea is voluntary and not the result of Governmental overreaching. That is exactly what the district court did when considering Lace's consent to the search of his car. There was no clear error in the district court's factual finding that consent was voluntarily given.

We have reviewed all of appellants' remaining arguments.[5] Most of them were considered and rejected by the district court in its well reasoned opinion. None of them merits discussion here.

The suppression orders and the judgments of conviction are affirmed.

NEWMAN, Circuit Judge, concurring in the result:

The facts of this case give new meaning to the term "invasion" of privacy. Dressed in military camouflage uniforms, 24 to 30 officers of the Vermont State Police moved onto a 70-acre tract of private property in Sharon, Vermont, leased by one of the appellants as his residence, and, working in eight-hour shifts, maintained 24-hour surveillance of the appellants for three weeks. Observations were made of the appellants while inside and outside a house on the property. The observations were so continuous as to include viewings of some of the appellants using a toilet. Among the devices used to enhance the officers' observations were field binoculars with 12-power magnification, a Bushness spotting scope with 45-power magnification, and a Questar lens with 130-power magnification. Some use was made of a Javelin nightscope, capable of magnifying existing light 50,000 times. The officers used infrared night goggles to facilitate their movement in the dark and concealed their presence not only by using the natural cover of trees and shrubs but also by cutting branches and brush to form a blind.

Without doubt there was an invasion. The Court suggests, however, that what was invaded by the exterior observations was not privacy,[1] at least not the reasonable expectation of privacy protected by the Fourth Amendment. Fortunately that suggestion is dictum, since the majority holds that, wholly apart from the results of the para-military surveillance at Sharon, the independent information in an affidavit presented to the state judge who issued the search warrant adequately established probable cause for the search of the premises. I agree with that holding and therefore concur in the result, but I write separately to register respectful disagreement with the majority's dictum, approving the exterior surveillance at Sharon, in the hope that this dictum will not in future cases ripen into a holding.

The majority's endorsement of the Sharon surveillance purports to draw support from two doctrines, each illustrated by a number of cases cited in Judge Van Graafeiland's opinion. The first is the "open fields" doctrine, which traces its Fourth Amendment lineage to *Hester v. United*

---

**5.** We agree with Judge Newman's comments urging caution in accepting guilty pleas that are subject to the number and variety of conditions found in the instant case. This Circuit's rule on conditional guilty pleas has not been adopted in all Circuits. *See United States v. DePoli*, 628 F.2d 779, 781 n.1 (2d Cir. 1980). The reasons for its rejection in other Circuits, as set forth in *United States v. Cox*, 464 F.2d 937, 944–45 (6th Cir. 1972), are peculiarly applicable where the plea is not conditioned upon the resolution of a single clear-cut legal issue which plays a pivotal role in the case. If a plea is tendered upon condition that more than one issue is reserved for appeal, the district court should satisfy itself that the reserved issues are significant to the outcome of the case.

**1.** The results of the interior observations were suppressed by the District Court, 502 F.Supp. 1021, 1040–41, and the correctness of that ruling is not in issue on this appeal.

*States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). The second is essentially a doctrine of waiver of Fourth Amendment protection as to items or activities willingly exposed to public view. In my judgment neither doctrine justifies the surveillance carried out in this case, nor do any of the cited cases remotely countenance what occurred here.

1. Both before and after *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), shifted the appropriate inquiry in Fourth Amendment cases from places to people, or, more precisely, to a person's reasonable or "legitimate" expectation of privacy, *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430 n.12, 58 L.Ed.2d 387 (1978), the "open fields" doctrine had been invoked to uphold police activity in a context totally different from the circumstances of this case. Police have been permitted to intrude upon open areas of privately owned property on a brief, one-time basis to make specific observations of items or events that were either observable from beyond the property [2] or about which the officers had prior information.[3] None of the cases cited by Judge Van Graafeiland,[4] nor any that I have located,[5] invokes the "open fields" doctrine to validate an open-ended, long-term surveillance conducted on private residential property in the hope of seeing evidence of crime.

The distinction between all the prior cases and this one goes to the heart of the Fourth Amendment's protection. The Amendment protects against "unreasonable" searches. *Katz* teaches that warrantless searches are unreasonable if they intrude upon a person's reasonable expectation of privacy. When a law enforcement officer sees smoke pouring from a factory chimney and steps onto an open area of the owner's property to make a more precise observation, *Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), or when an officer receives information that a cache of dynamite is hidden in a junked car in an open field and goes to look, *United States v. Ramapuram*, 632 F.2d 1149 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), his action is not "unreasonable"; it can fairly be said that he does not encroach upon an expectation of privacy that "society is prepared to recognize as 'reasonable.'" *Katz v. United States, supra*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). But when police officers execute military maneuvers on residential property for three weeks of round-the-clock surveillance, can that be called "reasonable"? Can it be doubted that society is prepared to recognize as "reasonable" the expectation of the tenant and his guests that the property will not be

---

**2.** *E.g., Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974); *United States v. Varkonyi*, 645 F.2d 453 (5th Cir. 1981); *United States v. Freie*, 545 F.2d 1217 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977).

**3.** *E.g., United States v. Ramapuram*, 632 F.2d 1149 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974); *Fullbright v. United States*, 392 F.2d 432 (10th Cir.), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968).

**4.** Of all the cases cited in the majority's opinion, the only one involving any long-term, surreptitious surveillance is *United States v. Hensel*, 509 F.Supp. 1376 (D.Me.1981). In *Hensel* the surveillance was conducted from locations *off* the defendant's property, although some instances of aerial surveillance occurred. The

degree of intrusiveness is reflected in the fact that the surveillance could not even identify any of the individuals observed. The one-time physical entry into the driveway resulted in observation only of a license plate number, as to which defendant had no reasonable expectation of privacy. *Id.* at 1386.

**5.** *McDowell v. United States*, 383 F.2d 599 (8th Cir. 1967), approved surveillance conducted on the open fields of private property, but the case is readily distinguishable from what happened here. In *McDowell* initial surveillance of fields suspected of being used for illegal hunting of migratory birds was conducted from locations off the defendant's property. When alerted by unusual activities in the fields, agents entered the fields on three occasions for a closer look. Their observations were confined to open areas, one-quarter to one-half a mile from the nearest farm building.

invaded for such purposes? I should think that even those in our society not overly fond of the Fourth Amendment and its implementing exclusionary rule would agree that every person may enjoy the privacy of his back yard secure in the belief that police officers are not bivouacked on his property just beyond the nearest tree line observing him with high-powered telescopes day and night for three weeks.

The "open fields" of private property are not open for any surveillance police officers choose to conduct, unrestricted as to duration, constancy of observation, location observed, or means of enhanced viewing. The narrow holding of *Hester* supports no such rule. Officers there approached the residence of an individual about whom they had prior information. When they saw another man drive up to the house, they concealed themselves and maintained observation only long enough to see the immediate episode at hand, the transfer of a quart of moonshine whiskey. Dealing with the contention that the officers' subsequent examination of a bottle and jug dropped on the ground violated the Fourth Amendment, Justice Holmes said that the "special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." 265 U.S. at 59, 44 S.Ct. at 446. If that observation was intended to mean that no Fourth Amendment protection extends beyond the house, its validity has not survived either the holding or the rationale of *Katz*, which extended Fourth Amendment protection to a person using a public telephone because the person was entitled to enjoy a legitimate expectation of privacy. *See United States v. Mullinex*, 508 F.Supp. 512, 514 (E.D.Ky.1980) ("The final analysis [after considering the impact of *Katz* upon *Hester*] is that 'open fields' are *not* per se outside the protective boundary of the Fourth Amendment, but a defendant's expectation of privacy in an open field must be an expectation that society would consider as reasonable.") (emphasis in original).

Courts have not had to consider whether police officers may occupy a property owner's open fields for prolonged and continuous surveillance of his back yard because, until today, it does not appear that police officers have asserted such authority. But many courts that have upheld surveillance conducted on, over, or from open fields have been careful to note the limited extent of the surveillance and to caution against unrestricted surveillance. *United States v. DeBacker*, 493 F.Supp. 1078 (W.D.Mich. 1980) (aerial surveillance of private property upheld because only isolated instances occurred); *State v. Stachler*, 58 Hawaii 412, 570 P.2d 1323 (1977) (same). *See United States v. Jackson*, 588 F.2d 1046, 1053 n.12 (5th Cir.) ("[T]his court may, under different facts, find a Fourth Amendment violation even though the government agents make their observations from an 'open field' "), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Brown*, 487 F.2d 208, 210 (4th Cir. 1973) (observing, even as to one-time appearance on property, "It is a bit disquieting that we must countenance federal snooping around farmers' barns as a legitimate investigative technique"), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *Fullbright v. United States*, 392 F.2d 432, 435 (10th Cir.) ("[W]e do not mean to say that surveillance from outside a curtilage under no circumstances could constitute an illegal search . . . ."), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968). As Judge Hillman observed in *United States v. DeBacker, supra*, 493 F.Supp. at 1081, "The ultimate question, therefore, is not whether the surveillance in this case occurred in 'open fields'. Instead, the issue is whether 'if the *particular form of surveillance* practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.' " (quoting Amersterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 403 (1974) (emphasis added)).

Moreover, even apart from the particular form of the surveillance, "absent exigent circumstances a warrantless search of one's home or its curtilage, when effected through trespass, violates the fourth amendment." *United States v. Van Dyke*, 643 F.2d 992, 993 (4th Cir. 1981). As Judge Friendly has pointed out, "Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis. The relevant question is . . . whether the defendant has a legitimate expectation of privacy in the area." *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). But obviously the nature of the area observed, its proximity to one's home, the extent of surrounding trees and shrubs, and the general setting of the area within the larger context of the total property are all relevant in assessing the reasonableness of an expectation of privacy. These defendants, while in the immediate area of the home one of them had rented on a 70-acre farm in rural Vermont, had a reasonable expectation of privacy that they would not be observed by highly intrusive surveillance conducted upon the open fields of the leased property.

2. I have no quarrel with the majority's general statement of its second proposition, "What was observable by the general public was observable without a warrant by the police as well." That statement, paraphrasing a sentence in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978), derives from the following sentence in *Katz v. United States, supra*, 389 U.S. at 351, 88 S.Ct. at 511: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Before endeavoring to apply that statement, it is well to identify its origins. The supporting citations in *Katz* are *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966), and *United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927). *Lewis* concerns observations made by an undercover agent invited into the defendant's home to purchase narcotics. The case involves mis-

placed confidence and does not illuminate the *Katz-Marshall* principle of public exposure, since nothing was viewed or viewable by the public. *Lee* concerns a view of items on the deck of a motor boat on the high seas by agents on a Coast Guard vessel. The case is more pertinent to a principle of public exposure because the items were located where any member of the public, at least any sea-going member, could see them, and the observation made by law enforcement officers was precisely the one that the defendant could have reasonably expected.

*Katz* itself supplies some content to the principle of "public exposure" by holding that even in an area accessible to the public, what a person seeks to preserve as private may be constitutionally protected. 389 U.S. at 351–52, 88 S.Ct. at 511–12. *Marshall v. Barlow's, Inc., supra*, adds an important qualification by making clear that exposure to some limited segment of the public, there employees, is not the sort of public exposure that removes Fourth Amendment protection against government observations. *See also Mancusi v. DeForte*, 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968) (defendant who shared an office entitled to Fourth Amendment protection for its contents, even though he could expect that contents would be observed by those who shared the office and by their business and personal guests).

In suggesting, albeit in dictum, that the exterior surveillance at Sharon impaired no Fourth Amendment right of the defendants because the area viewed was exposed to the public, the majority has extended the public exposure doctrine in two significant respects beyond the holdings of other courts. The first extension concerns who could have made the observations; the second concerns the location from which they could have been made.

Though the District Court stated that "outsiders" could enter the Sharon property "at will," 502 F.Supp. at 1038, Judge Holden's specific factual findings make clear that he is not referring to the public at large but only to a narrow segment. The

owners (two couples) retained the right to use the property for recreational purposes, neighbors had permission to use the pond, and hunters could hunt on the property. *Id.* at 1026–27. Since it is undisputed that the surveillance occurred out of the hunting season, the "outsiders" whose observations the defendants risked were the owners and neighbors when using the pond. No doubt defendants did bear the risk that an owner or neighbor might observe unlawful activity and report it to the police, just as the defendant bore the risk in *Marshall v. Barlow's, Inc., supra,* that employees would report OSHA violations to Government inspectors. 436 U.S. at 315, 98 S.Ct. at 1821. But risking observation by a limited category of persons is not the equivalent of public exposure and does not displace a reasonable expectation of privacy against "governmental intrusion." *Mancusi v. DeForte, supra,* 392 U.S. at 368, 88 S.Ct. at 2123.

As to the location from which the back yard at Sharon was observable, it could be seen from a point on what Judge Holden called an "unimproved town road," 502 F.Supp. at 1026. But it is undisputed that the surveillance was not made from this point. The majority cites no case where the risk of being observed from one spot accessible to the public has been considered the sort of public exposure that relinquishes a reasonable expectation of privacy that surreptitious observations will not be made from locations on private property. In fact, all of the cases cited by the majority that uphold police observations on a "public exposure" theory involve sightings made from precisely the location from which the defendant knew or should have known he was observable.

**6.** Even that circumstance would not necessarily validate an observation made from a location on the defendant's property.

**7.** While I do not share the majority's concern that defendants' briefs omit the word "innocent," since their guilty pleas with a reservation of appellate rights usefully saved considerable time and expense, some comment on the plea procedure is warranted. The practice of pleading guilty with a reservation of right to

Perhaps cases may arise where a person is observable from several locations accessible to the public and may thereby be deemed to have exposed himself to the public so as to lose any reasonable expectation of privacy against government observation, even from some other location.[6] But surely that situation is not reached by people in the back yard of a rural Vermont farm property, simply because observation was physically possible from one point on a rarely used road. A person in a back yard reading Karl Marx or sunbathing in the nude is entitled to rely on his or her own sense of whether anyone is at the one point on an adjacent road from which observation is possible. They take the risk of not hearing a car or otherwise not realizing that someone is there, but that slight risk does not expose them to three weeks of 24-hour surveillance by camouflaged police officers peering through telescopes from concealed positions on their property.

To summarize, the exterior surveillance of the defendants in the area of the house at the Sharon property, though conducted from an "open field" of the property, violated the defendants' reasonable expectation of privacy because of the offensively intrusive manner in which police officers operated on the property, and that reasonable expectation of privacy was not displaced by the possibility that a few identifiable people might have observed the defendants from locations on the property or that anyone might have observed them from one point on a little-used, unimproved road. I regret that the majority, even in dictum, has expressed approval of what occurred in this case. Since the surveillance I regard as unlawful was not essential to the validity of any of the challenged searches and seizures, I concur in the result.[7]

appeal a pre-trial ruling has been used in the context of a single pre-trial issue that all sides recognized would be dispositive of the entire case. *See, e.g., United States v. Faruolo,* 506 F.2d 490, 491 n.2 (2d Cir. 1974) (voluntariness of consent to search); *United States v. Rothberg,* 480 F.2d 534, 535 & n.1 (2d Cir.) (construction of statute defining offense), *cert. denied,* 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973); *United States v. Mann,* 451 F.2d 346, 347 (2d Cir. 1971) (pre-trial delay). The prac-

58

tice was suggested to our Circuit by Judge Friendly in *United States v. Doyle*, 348 F.2d 715, 719 (2d Cir.), *cert. denied*, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965), though previously used elsewhere, *e.g., Jaben v. United States*, 333 F.2d 535 (8th Cir. 1964), *aff'd without consideration of the point*, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965). *But see United States v. Mizell*, 488 F.2d 97 (5th Cir. 1973) (rejecting the practice).

The use of the practice in this case to preserve for appellate review a considerable number of issues is potentially troublesome. Suppose, for example, we had found one of the several challenged seizures unlawful. Under the terms of the defendants' plea agreements, it would certainly be arguable that upon a determination that even one seizure was unlawful, the defendants could withdraw their guilty pleas. Yet if the lawfulness of the seizures had not been adjudicated until after a trial, the unlawfulness

of any one seizure might well have been found to be harmless error, in light of the weight of the admissible evidence. Pleading guilty with a reservation of appellate rights should not be a device to circumvent the harmless error rule. The problem does not arise in this case since we affirm the results of all of the pre-trial rulings. But it is a problem to which the Government and District Judges should be alert in accepting conditional guilty pleas hereafter. When multiple pre-trial rulings concerning evidence are to be challenged, one solution would be for the parties to stipulate, for purposes of the conditional guilty plea, to an agreed statement of the admissible evidence apart from the challenged rulings, with withdrawal of the plea permitted only upon an appellate determination that a pre-trial ruling was not only erroneous but prejudicial in light of the stipulated evidence.