[Civ. No. 47416. First Dist., Div. One. Mar. 5, 1980.]

JOSEPH EDWIN SOLI et al., Petitioners, v.
THE SUPERIOR COURT OF MENDOCINO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Scott LeStrange, Public Defender, Thomas S. Brigham and Rawles, Hinkle, Finnegan, Carter & Brigham for Petitioners.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Morris Lenk, Deputy Attorneys General, for Real Party in Interest.

OPINION

**ELKINGTON, Acting P. J.**—Petitioners Joseph Soli and Raymond Soli stand charged in the superior court with grand theft of a bovine animal

(Pen. Code, § 487, subd. 3), and with the misdemeanor offense of violating Penal Code section 597a. On their petition for a writ of prohibition, we inquire into the legal sufficiency of an order denying their motion to suppress certain evidence essential to their prosecution. (See Pen. Code, § 1538.5.)

(We shall for convenience hereafter refer to the two petitioners, without distinction, simply as petitioners, and as they themselves do in their briefs.)

■ In our ensuing discussion, we follow the well-settled rule stated by the high court in *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621], in this manner: "'"A proceeding under section 1538.5 to suppress evidence is one in which a full hearing is held on the issues before the [trial] court *sitting as a finder of fact.*" . . .' . . . In such a proceeding the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence."

The relevant evidence before the superior court as it fairly and reasonably might have been, and presumably was, accepted and believed, follows.

A Mendocino County resident had observed, adjacent to a highway, the head and skin of a recently killed Black Angus cow. He reported his find to the county sheriff's office. Deputy Sheriff Frank Rakes (hereafter for convenience, the sheriff) responded to the scene. An examination disclosed two bullets in the animal's head which were, respectively, "consistent with having been fired from a Winchester caliber .30 W.C.F. rifle," and from a "Charter Arms .357 magnum revolver, . . ." The skin bore a brand mark which was registered to Charles Sizemore, a Mendocino County cattle rancher.

The sheriff communicated the information to Sizemore who had been unaware of his loss. Sizemore was engaged in unrelated pressing business at the time, but said that "he was going to look around when he could get up to his ranch; . . ." The sheriff told him "he should get up there and look around, . . ." In the meantime the sheriff, who was assigned as county "livestock investigator," searched the completely

fenced 1,200-acre Sizemore ranch 4 or 5 times. Finally, while with Sizemore, he found a place in the fence where "the wire had been cut."

A day or two later Sizemore returned to the hole in the fence. He observed "some tracks on the other side of the fence...." Beyond the fence were several large unfenced parcels of property under different ownerships. Two or three parcels away was unfenced land owned by petitioners. The several parcels were traversed by a rough dirt road leading from an unlocked gate in Sizemore's fence. (The magistrate of the preliminary hearing, the transcript of which constituted the greater part of the superior court evidence, found the gate "clearly a common gate used by both Solis and Sizemore.")

Sizemore started to follow the tracks he had observed. With his dog he traced them with some difficulty for a mile or more without passing a fence, or gate, or other barrier. The tracks then went "up the hill" and "into some timber." In the timber or at its edge Sizemore "found the stomach contents," i.e., a large "pile" of animal entrails which he identified as removed from a cow. The entrails were on petitioners' land and from that point could be seen a small wooden shack and house trailer 30 or more feet away. Sizemore promptly reported his observations to the sheriff who, contacting a deputy district attorney, was instructed to go with Sizemore "to determine if they were, could be cow guts from my case."

The sheriff and Sizemore did so, traveling by automobile through the unlocked gate on Sizemore's fence and, unlike Sizemore earlier, along the dirt road—"It's all open country. There are no fencelines"—until they came to a low-lying wire stretched across the road on petitioners' property, which otherwise was also unfenced. He and Sizemore stepped over the wire. The two then went into the timber where the cow's entrails were again observed.*

The deputy district attorney thereafter prepared, and the sheriff swore to the truth of, affidavits for a search of the homes of petitioners,

---

*There was evidence at the superior court hearing which we find irrelevant to the conclusion we reach. It was "a fairly common thing among cattle ranchers that when your cow is missing or there is some suspicion of rustling, that you get together and search the area of the victim's property." And the superior court judge seemed obliquely to confirm this practice, and more, by saying: "I don't suppose the court can take judicial knowledge of long-standing customs in this county and how people travel around it."

respectively, in Ukiah in Mendocino County and San Bruno in San Mateo County. All of the above-related matters, including the details of both entries and searches upon petitioners' land were fully and fairly reported in the affidavits. (Petitioners make no contrary contention.) Upon the affidavits' presentation to a magistrate search warrants were issued. Upon their execution, boots covered with cow's blood and guns of the caliber of the bullets found in the cow's head, were found in petitioners' possession. And the crime's perpetration was thereafter admitted by petitioners, or one of them.

Petitioners' contentions on their motion to suppress evidence in the superior court may reasonably be reduced to the following:

(1) Both of the searches violated petitioners' *"reasonable expectation of privacy"* (italics added), and were accordingly proscribed by the Fourth Amendment.

(2) The second search "was an illegal 'confirmation search' under the recent Supreme Court holding in *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]...."

■ At the conclusion of the hearing the superior court found no reasonable "expectation of privacy in this situation," and that there was "nothing unreasonable" about the search and "there is thus no [confirmatory] search as was prohibited in *People* v. *Cook*, 22 [Cal.3d] 67." The motion to suppress the "fruits" of the searches was denied, and these proceedings in prohibition followed.

We treat petitioners' superior court contentions, as we must, as a statement of the issues of our review. Points here raised for the first time will not be considered. (See *People* v. *Gallegos* (1971) 4 Cal.3d 242, 249-250 [93 Cal.Rptr. 229, 481 P.2d 237]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 294-295 [82 Cal.Rptr. 161, 461 P.2d 361].)

We consider now the first contention of petitioners, i.e., that *both of the searches* violated their reasonable expectation of privacy.

It is, of course, a truism of our law that "the Fourth Amendment protects people, not places." (*Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507].)

But people will have a constitutionally protected expectation of privacy according to the nature of the place in which they claim it.

"The pattern of prior decisions suggests that one of the most crucial determinants of the validity of warrantless searches is the nature of the place subjected to search. This pattern has been created by the interweaving of constitutional concepts with fundamental human needs and expectations. The courts have implicitly recognized that man requires some sanctuary in which his freedom to escape the intrusions of society is all but absolute....Certain other places carry with them an expectation of privacy which, although considerable, is less intense and insistent. These places may be searched upon probable cause alone under circumstances of less demanding urgency. Still other sites are regarded as so public in nature that searches are justifiable without any particular showing of cause or exigency. This hierarchy of protection arises not from the application of differing constitutional standards to various locales, but rather from an application of a single standard of reasonableness to all places in accordance with a fundamental understanding that a particular intrusion into one domain of human existence seriously threatens personal security, while the same intrusion into another domain does not." (*People* v. *Dumas* (1973) 9 Cal.3d 871, 881-883 [109 Cal.Rptr. 304, 512 P.2d 1208]; fns. omitted.)

The highest of Fourth Amendment protection extended to people is in their "houses." "[W]arrantless searches of a private dwelling are unreasonable per se in the absence of one of a small number of carefully circumscribed exceptions...." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 270 [127 Cal.Rptr. 629, 545 P.2d 1333].) Such dwellings are "ordinarily afforded the most stringent Fourth Amendment protection." (*United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, 561 [49 L.Ed.2d 1116, 1130, 96 S.Ct. 3074].) "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." (*Dorman* v. *United States* (D.C.Cir. 1970) 435 F.2d 385, 389.)

A lesser degree of constitutional concern is shown in respect of such places as a person's automobile. There, "one's expectation of privacy [is] significantly different from the traditional expectation of privacy and freedom in one's residence." (*United States* v. *Martinez-Fuerte, supra*, 428 U.S. 543, 561 [49 L.Ed.2d 1116, 1130].) And "business premises may...reasonably be [searched] in many more situations than

private homes,..." (*See* v. *City of Seattle* (1967) 387 U.S. 541, 545-546 [18 L.Ed.2d 943, 947-948, 87 S.Ct. 1737].)

Near the bottom of this descending scale will be found places such as *"open fields."*

"[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." (*Hester* v. *United States* (1924) 265 U.S. 57, 59 [68 L.Ed. 898, 900, 44 S.Ct. 445].) "Open fields" are among the places "regarded as so public in nature that searches are justifiable without any particular showing of cause or exigency." (*People* v. *Dumas, supra*, 9 Cal.3d 871, 882, and fn. 10.) "The Fourth Amendment protection against unreasonable searches and seizures does not extend to open fields." (*United States* v. *Basile* (9th Cir. 1978) 569 F.2d 1053, 1056; to the same effect see wide authority collected in U.S.C.A., Const., Amend. 4, Note 123, and supps. thereto.)

Nevertheless, and despite what appears to be the great weight of authority, some courts appear to reject the absolutism of *Hester* v. *United States, supra*, 265 U.S. 57, and to apply, in the case of "open fields," the basic Fourth Amendment principle restated in *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]: "There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances...and on the total atmosphere of the case."

The general purport of such cases is well summarized by *United States* v. *Freie* (9th Cir. 1976) 545 F.2d 1217, 1223, as follows: "It now appears that *Hester* no longer has any independent meaning but merely indicates *that open fields are not areas in which one traditionally might reasonably expect privacy.*" (Italics added.)

*People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713] may reasonably be deemed one of these authorities. There the court concluded (p. 1100) that "open fields or grounds around a house" may in rare situations, and depending upon facts and circumstances, be the subject of a reasonable expectation of privacy. Among the circumstances to be considered are the open space's "'proximity or annexation to the dwelling, its inclusion within the general enclosure

surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family.'" (*Id.*, p. 1101, fn. 2.)

It is notable also that: "The fact that a search may or may not involve a trespass or other invasion of defendant's property interests is not conclusive, for 'The prohibition in the [Fourth] amendment is against unreasonable searches and seizures, *not trespasses.*'" (Italics added; *People* v. *Krivda* (1971) 5 Cal.3d 357, 365 [96 Cal.Rptr. 62, 486 P.2d 1262] [overruled on other grounds in *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 77 [123 Cal.Rptr. 465, 539 P.2d 33]), and *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 10, fn. 6 (136 Cal.Rptr. 409, 559 P.2d 1028)].) The "search of open fields without a search warrant is not constitutionally 'unreasonable.' ...This is true *even though entrance to the area searched was gained by trespass.*" (Italics added; *McDowell* v. *United States* (8th Cir. 1967) 383 F.2d 599, 603.) The rule that "a technical trespass on the part of the officer" does not necessarily create a Fourth Amendment violation seems to be universally followed. (See *Hester* v. *United States, supra,* 265 U.S. 57, 58 [68 L.Ed. 898, 899]; *United States* v. *Johnson* (D.C.Cir. 1977) 561 F.2d 832, 841; *United States* v. *Cain* (7th Cir. 1972) 454 F.2d 1285, 1286; *United States* v. *Hanahan* (7th Cir. 1971) 442 F.2d 649, 654; *Atwell* v. *United States* (5th Cir. 1969) 414 F.2d 136, 138.)

Under the authority we have cited and the evidence produced on the motion to suppress there was, in our opinion, controlling law and substantial evidence (see *People* v. *Lawler, supra,* 9 Cal.3d 156, 160) supportive of the superior court's determination that petitioners had no reasonable expectation of privacy in respect of the bovine entrails they had discarded, or the place where they were found. The questioned entries, although perhaps technically trespasses, were over open fields and not reasonably subject to the rare exception of *People* v. *Edwards, supra,* 71 Cal.2d 1096, 1100, 1101, footnote 2. The area where Sizemore's cow's entrails were found had little proximity and no annexation to any dwelling, and it was neither within a "general enclosure surrounding [a] dwelling" nor was "its use and enjoyment...an adjunct to the domestic economy of [a] family."

Nothing is found in our recent opinion of *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421 [158 Cal.Rptr. 86], tending to impugn the conclusion we have reached. There, sheriff's officers had probable cause for obtaining a search warrant but wilfully, or negligently, sought

none. The officers in *Burkholder* traveled past many "no trespassing signs," and through locked gates, using master keys. At one of the gates the entry was made in spite of Burkholder's personal and express opposition, and what must reasonably be deemed his bodily interposition. And the area searched was a closely knit complex of Burkholder's residential travel trailer, a completely enclosed growing field, a fully equipped water system, and an electric generator and power supply. It fitted precisely the above mentioned criteria of *People* v. *Edwards,* and could not reasonably be deemed an "open field." Under all the "facts and circumstances...and on the total atmosphere of the case," we concluded that Burkholder had a reasonable expectation of privacy against a warrantless search.

Indeed, in our opinion, we recognized sub silentio in *Burkholder* the controlling California law as expressed in *People* v. *Dumas, supra,* 9 Cal.3d 871, 882, and footnote 10, that *open fields* are among the places *"regarded as so public in nature that searches are justifiable without any particular showing of cause or exigency."* (Italics added.)

■ We advert now to the petitioners' second contention, i.e., that the second search, by Sizemore and the sheriff, "was an illegal 'confirmation search' under...*People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]...."

We first observe that the subject of *Cook* was two or more illegal, warrantless, and extensive, searches of a *private dwelling* by a deputy district attorney and a police officer *before* any application for a search warrant. Thereafter, and without mention of those searches, the deputy district attorney prepared, and the officer signed and swore to the truth of, an affidavit for a search warrant. Evidence indicated that the essential and material allegations of the affidavit were "intentionally" and "absolutely false." Upon Cook's motion to suppress, the prosecution had assumed, "'for the sake of argument,'" that the "charges of perjury [and subornation of perjury] were all true...." (*Id.,* p. 77.) And the superior court refused to allow the parties to the false affidavit to be examined on the issue. In the case at bench, and as noted, the questioned searches were upon open fields under circumstances unproscribed by the Fourth Amendment, and were honestly reported to the magistrate.

And patently *Cook* does not hold a "confirmation search" to be invalid per se, even though *not* violative of constitutional standards.

Moreover, we note that *Cook*'s rationale, and holding, were that an *intentionally*, or *negligently*, false search warrant affidavit may not be cured by excising its untrue, and retaining its legitimate, recitals. In its entirety the affidavit will be rejected under the rule of "'falsus in uno, falsus in omnibus,...'" (*Id.*, p. 86.) The holding has no application whatever to the case at bench.

Another of *Cook*'s comments seems relevant here. The court carefully noted that the exclusionary rule is designed only to discourage *intentional* and *negligent* misconduct of law enforcement officers. Reasonable, but mistaken acts, done in *good faith* at the time, will not be penalized by suppression of evidence. For the rule "does not require police officers to know or even anticipate complex constitutional doctrines." (*Id.*, pp. 87-88.) Were we to assume, which we do not, that under the complex rules and divergent views and interpretations of the law of "search and seizure," the deputy district attorney and sheriff of this case erred, it cannot reasonably be said that they were negligent. For on a subject where judges and scholars disagree among themselves, a prosecutor's and officer's good faith decision may not logically be faulted.

█ For yet another reason the search warrants of this case must be upheld.

We have in our preceding discussion treated Sizemore's initial search upon adjacent lands, *arguendo only*, as state action reasonably to be equated with the second search by the sheriff. But we are also impelled to a conclusion that Sizemore's was *not* such state action. The sheriff's above mentioned admonition to him that "he should get up there [to his ranch] and look around," may not reasonably be deemed to have been a direction to search upon other persons' land. And even were the admonition deemed ambiguous, that ambiguity was resolved by the superior court in favor of the validity of Sizemore's search. (See *People v. Lawler, supra*, 9 Cal.3d 156, 160.)

"'The conduct of a person not acting under the authority of a state is not proscribed by the Fourth or Fourteenth Amendments of the federal Constitution.'" (*People v. McKinnon* (1972) 7 Cal.3d 899, 911-912 [103 Cal.Rptr. 897, 500 P.2d 1097].)

And information from one reasonably believed to be the victim of a reported crime will be deemed reliable, thus furnishing Fourth Amend-

ment probable cause for a search warrant. (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 421-422 [96 Cal.Rptr. 455, 487 P.2d 1023] [overruled on other grounds in *People* v. *Cook, supra*, 22 Cal.3d 67, 99]; *People* v. *Schulle* (1975) 51 Cal.App.3d 809, 814-815 [124 Cal.Rptr. 585].) In the case at bench the deputy district attorney, the sheriff, and apparently the magistrate and superior court, were under the not uncommon, but erroneous, impression that the crime's victim, Sizemore, was not "reliable" under Fourth Amendment standards, since he had not previously so established himself.

As noted, the affidavit proffered by the sheriff for the search warrants fully and fairly reported *all* of the relevant incidents, including Sizemore's detailed report of his earlier search for evidence relating to his stolen animal upon the land of petitioners. Of itself that information furnished probable cause for a search warrant.

Our high court's recent case of *People* v. *Cook, supra*, 22 Cal.3d 67, teaches that where a search warrant affidavit contains constitutionally offensive matter (here, arguendo, the report of the *sheriff's* search), that matter will be excised. As said by the court: "'We require only that such information be deleted and the warrant's validity be tested by the remaining accurate information.'" (P. 83.) "[T]he remainder of the allegations are untouched...and...the reviewing court should accept them as true." (Pp. 84-85.)

The deleted material of *Cook*'s above described discussion concerned *good faith*, but *erroneous*, allegations. But by logical analogy and extension, the holding will necessarily here apply. And it will further be noted that the sheriff's search exploited no previous constitutional violation, for such a violation does not appear.

Treating the information of the sheriff's search as deleted, our consideration of the affidavit at issue discloses probable cause for issuance of the search warrants.

For these several reasons the order denying petitioners' motion to suppress evidence was without error or abuse of discretion.

The peremptory writ of prohibition is denied and the extant alternative writ is discharged.

NEWSOM, J.—I concur in the result reached by Justice Elkington, but for somewhat different reasons.

It will be remembered that the ultimate source of the information which led to petitioners' arrest and conviction was the casual observation, made by a private person, of the remnants of a recently butchered cow. This information was conveyed to a deputy sheriff, who, upon investigation, determined that the cow belonged to Mr. Sizemore. Upon hearing of his loss, the latter decided, of his own volition, and independently of a later suggestion by the deputy that he do so, to "have a look around." In doing so, Sizemore became a technical trespasser, because, while unsure of whose land he had come upon, he knew that it was not his own. But the fact of such technical trespass does not vitiate the truth, or preclude the use, of the observations he then made and imparted through the deputy to the affiant upon whose sworn statement the warrant issued. (*People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]; *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 222 [113 Cal.Rptr. 175, 520 P.2d 991].)

The *Cook* decision cannot, I think, reasonably be read as a holding that wherever a "confirmatory" search is made which involves intentional trespass by a public officer, no excision of any such illegally obtained evidence can ever be made. There, the initial illegal entry by a private person was on residential property, while here the "first" search was through unfenced lands in which no indicia of expected privacy were displayed. And there, too, egregiously illegal police conduct was involved in the confirmatory search, and the affidavit in support of the subsequent warrant was riddled with perjury. No such conduct occurred in the case at bar—all facts were fully and honestly reported.

Not only are the facts of *Cook* dissimilar from those of the present case, but the expressed rationale of that decision does not in my opinion require us to exclude all evidence which is tainted.

In its discussion of the exclusionary rule, the court in *People* v. *Cook, supra,* 22 Cal.3d 67, 87-88 explained: "[The rule] does not require police officers to know or even anticipate complex constitutional doctrines. Nor does it penalize them for acts which, although negligent when viewed with hindsight, were done in good faith at the time. It simply seeks to deter the police from lying to the magistrate—surely an obvious prohibition which all can understand and obey." By negative

implication, the rationale of *Cook*, as expressed above, does not forbid excision where the initial evidence was obtained by a private citizen acting in good faith. We are not confronted with intentional (i.e., "bad faith") misstatements in affidavits. As I read *Cook*, therefore, excision may still be employed to cleanse the affidavit.

My conclusions are based upon no absolute formula, but on the "facts and circumstances" and the "total atmosphere" of the case at bar. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] [cert. den. 364 U.S. 841 (5 L.Ed.2d 65, 81 S.Ct. 79)].) And having said this, I will add that I find nothing inconsistent between these contentions and our recent holding in *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421 [158 Cal.Rptr. 86]. In *Burkholder* we found that petitioner's reasonable expectation of privacy had been violated by a police search; here we need only concern ourselves with the observations of a private citizen; hence, no state action is involved and the petitioner's reasonable expectation of privacy is not in issue.

**GRODIN, J.,** Dissenting.—With all respect for my colleagues, I view this case as indistinguishable from *Burkholder* v. *Superior Court* (1979) 96 Cal.App.3d 421 [158 Cal.Rptr. 86], as regards the validity of the second search; and I believe *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130], precludes the rationale relied upon in the alternative by Justice Elkington (but forming the sole basis for Justice Newsom's opinion) that the validity of the second search is irrelevant to the admissibility of the evidence. I therefore dissent.

There is in this case little if any dispute concerning the facts. I quote from the parties' *stipulated description* of Soli's land, the road leading to it, and the clearing where the entrails were found:

"Number one, that Joseph Soli owns assessor's parcel number 14-430-45; and, 14-430-46. That this consists of a [*sic*] 160 acres, more or less. That the property is located approximately three miles southwest of Laytonville. That the property is accessible by road only from Highway 101 and then only through a gate with a lock on it. That from the locked gate to Soli's land is approximately four miles across the rough road. That the road passes through Charles Sizemore's lands, then through a gate to another person's land and then to Soli's property. That the parcel between Soli's and Sizemore's land is approximately 160 acres in size. That near Soli's southern property line the

same road meets a locked cable gate on Soli's land and that this gate is maintained by Soli.

"That Soli has a 'private property keep out' sign on a tree visible from the cabled gate. That after passing through the cable gate in a northerly direction one passes through a grove of trees for approximately 200 feet before coming to a clearing which is enclosed on all sides by trees, where Soli maintains a trailer home, a cabin and other out structures.

"That a portion of Soli's land along the south end of the grove of trees which would be near the gate is fenced, that the clearing is not visible from any neighboring lands. That there are no other roads, public or private, which leads [sic] to the clearing or to the grove of trees. That the clearing and grove of trees are surrounded on the west, north and east by steep terrain. And finally, that all observations, photos, tangible evidence and statements by the defendants were the fruits of the initial intrusion by Deputy Rakes on January 25, 1979."

It is undisputed that the entrails were found at the edge of the clearing, only 20 or 30 feet from the cabin. Soli testified that he located the cabin and trailer in the clearing for privacy reasons, and that he lived there on weekends. In addition to the "private property keep out" sign described in the stipulation, there was a "no trespassing" sign on the gate itself.

We are not dealing, therefore, with "open fields"; we are dealing with a trespass into someone's private and enclosed yard adjacent to his weekend residence, under circumstances in which the owner has clearly and unmistakably indicated his desire to be left alone. Unless people waive their right of privacy by choosing to live in a rural area, it seems to me that Soli's Fourth Amendment interest is quite substantial.

Soli's privacy interest is, in any event, at least as great as that of the defendant in *Burkholder*. Indeed, it would be difficult to find two cases so similar on the facts. I quote from that opinion: "Herein, petitioner clearly entertained a subjective expectation of privacy in cultivating the marijuana patch on the property leased by him and under physical circumstances precluding visual detection from abutting property. Entry to the property was openly restricted by posted signs along, and locked gates across, the rural access road signifying an intention to deny access to the public in general, including government agents. (Cf. *People* v.

*Krivda* (1971) 5 Cal.3d 357, 367...[overruled on other grounds, *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 11, fn. 6..., and *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 77...]; *People* v. *Sneed, supra,* 32 Cal.App.3d 535, 542 [108 Cal.Rptr. 146].) The patch itself, located upon the side of a hilly area surrounded by trees, was totally concealed from view at ground level. The existence of the travel trailer supports an inference that petitioner at least occasionally resided upon the leased property. Unlike the factual circumstances disclosed in the cases upon which the People rely (*People* v. *Superior Court (Stroud), supra,* 37 Cal.App.3d 836 [112 Cal.Rptr. 764] [contraband in plain view from adjoining property]; *Dean* v. *Superior Court, supra,* 35 Cal.App.3d 112 [110 Cal.Rptr. 585] [public view of marijuana growth from a vantage point on a 'well-worn' foot path apparently open to public use]; *People* v. *Little, supra,* 33 Cal.App.3d 552 [109 Cal.Rptr. 196] [property contiguous to highway and public facilities in a suspected crime area]), the marijuana patch was not in plain view and became observable only through a flagrant disregard of well-recognized 'indicia' or 'badges of private ownership' intended to exclude the general public. Nor were any unrestricted common areas or adjoining trails shown to exist inviting access to any part of the subject property. (Cf. *Phelan* v. *Superior Court, supra,* 90 Cal.App.3d 1005, 1011-1012 [153 Cal.Rptr. 738].) [¶] Under the totality of facts and circumstances shown, petitioner's subjective expectation of privacy was objectively reasonable, no sound basis being apparent to reasonably foresee or anticipate that uninvited government agents would enter to perform a warrantless exploratory search. (See *Phelan* v. *Superior Court, supra,* 90 Cal.App.3d 1005, and cases discussed at pp. 1012-1013.) Short of erecting an impenetrable enclosure, we can conceive of no other feasible measures the rural dweller might reasonably undertake to assert and preserve his individual right of privacy. We agree with the *Phelan* court that no perceptible difference exists 'between [wholly] fenced land on the one hand and open land having a particular enclosed area on the other hand, insofar as the Fourth Amendment is concerned.' (*Id.,* at pp. 1016-1017.) To contemplate a contrary conclusion would itself lend credence to a specter of citadel-like fortifications in order to safeguard an otherwise objectively reasonable expectation of privacy of the contemporary rural dweller, a refuge neither required by nor compatible with established constitutional principles." (*Burkholder* v. *Superior Court, supra,* 96 Cal.App.3d at pp. 428-429.)[1]

---

[1] I note that Justice Elkington's description of the facts in *Burkholder* goes somewhat beyond the facts stated in that opinion.

In my view, therefore, the second search constituted an invalid intrusion in violation of the Fourth Amendment. My colleagues seek to justify the warrant notwithstanding that intrusion on the ground that Sizemore's report (which I concede was not the basis of an illegal search) of itself provided sufficient basis for the warrant. That rationale, however, is clearly precluded by *People* v. *Cook, supra*, 22 Cal.3d 67. In that case, after dealing with the *independent* issue as to the effect upon a warrant of intentional misstatements in the underlying affidavit (*id.*, at pp. 78-92), the court proceeded to consider Cook's claim that the affidavit was defective because it failed to advise the magistrate of a prior "confirmatory" search. The court held that the omission of this information from the affidavit did not provide a basis for attacking the affidavit or the warrant (*id.*, at p. 93), but that the *fact* of the confirmatory search could be asserted in the subsequent suppression hearing as grounds for urging that "the evidence seized pursuant to the warrant [was] inadmissible under general constitutional principles." (*Id.*, at p. 94.) The court then proceeded to overrule *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023], which held that the "magistrate's independent decision to issue the warrant was in no way tainted by the officer's illegal personal observations." (*Id.*, at p. 423.) The majority reasoned that under *Krauss* "a police officer need not rely solely on lawfully obtained probable cause; he can instead achieve 'certain cause' by conducting an unlawful confirmatory search, thus saving himself the time and trouble of obtaining and executing a warrant if he does not find the evidence. . . . Yet every time he fails to find the suspected evidence, he has also invaded the privacy of a citizen innocent of any wrongdoing. The second 'search' is therefore constitutionally unreasonable because it significantly contributes to increasing the risk of such invasions of privacy." (22 Cal.3d at pp. 98-99.) Thus, upon proof of an unlawful search by law enforcement officials, "the evidence seized in the subsequent search of his premises under color of warrant will be inadmissible against him." (*Id.*, at p. 99.) We are bound by *Cook*, and *Cook* requires reversal.

Petitioners' application for a hearing by the Supreme Court was denied April 30, 1980.