Filed 9/20/13  P. v. Nampula CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055708 |
| v. | (Super.Ct.No. FSB803567) |
| JOSE NAMPULA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Defendant and Appellant.

1

# I. INTRODUCTION

Defendant Jose Nampula appeals from his conviction of two counts of attempted willful, deliberate, and premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a)) with associated enhancements (§§ 12022.53, subds. (b)-(d), 186.22, subd. (b)(1)(C)) and his resulting prison sentence of 80 years to life.

Defendant contends: (1) the trial court erred in denying his motions to suppress evidence and to quash and traverse the search warrant because the affidavit in support of the search warrant lacked sufficient information to support a conclusion that he had committed a crime or that evidence of the crime would be found at his residence; (2) his confession was involuntary, and its admission at trial violated his constitutional privilege against self-incrimination, his right to counsel, and his right to due process; and (3) the sentence of 80 years to life constituted cruel and unusual punishment. We find no error, and we affirm.

# II. FACTS AND PROCEDURAL BACKGROUND

Sometime after midnight on May 1, 2008, Carl Vandusen was driving his friends, R.A. (age 16) and E.A. (also age 16), past E.A.'s house at 1007 West Belleview Street in San Bernardino, when they saw someone standing in the front yard looking into a window. E.A. got out of the car, jumped over the fence, and approached within a couple of feet of the man in the yard. R.A. also got out of the car.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

R.A. testified that he heard E.A. ask the man who he was and what he wanted. The man said, "'I'm looking for Steven.'" E.A. replied, "'I'm Steven.'" The man said, "'I got something for you,'" and he pulled out a gun and fired six or seven shots in the direction of E.A. and R.A., who both fell to the ground. The man then fled into the alley behind the house. Five expended .40-caliber Smith and Wesson shell casings were recovered at the scene. After the shooting, E.A. went to Mexico and therefore did not testify at trial.

R.A. was hit by two bullets in the back. One of the shots severed his spine, and the injury rendered him a paraplegic from the waist down. E.A. received gunshot wounds to his wrist and abdomen, for which he required surgery.

When the men were lying on the ground after being shot, R.A. heard E.A. say not to worry about it; it was "Chino from the Flats" who had shot them. R.A repeated that statement to his mother at the hospital, and on May 20, 2008, he told Detective Scott Murray of the San Bernardino Police Department the same thing. R.A. did not know what E.A. was talking about; he did not know who "Chino" was or what the term "the Flats" was, and he had never seen the shooter before.

Someone gave R.A. a photograph of defendant and said, "from word of mouth from the streets and everything, that he was the one that shot." On August 4, 2008, R.A. gave the photograph to Detective Murray. R.A. told the detective the person who gave him the photograph said the shooter was known on the streets as "Devil."

3

Vandusen described the shooter as a Hispanic male about five feet four inches tall, with a tan complexion and very short hair. [2] Vandusen identified defendant's photograph from a photo lineup in September 2008 and identified defendant in court as the shooter. Vandusen testified he had seen defendant before because they lived in the same neighborhood, although Vandusen did not know defendant's name. Vandusen saw defendant riding a bicycle in the neighborhood a few days after the shooting; defendant stuck his tongue out at Vandusen. Vandusen then believed defendant had been the shooter. Vandusen did not know defendant had the nickname "Chino," but he recognized defendant as the shooter because he had "'Chinese eyes.'"

About four days after the shooting, an anonymous tipster told the police that the man who had shot E.A. and R.A. lived at 1055 West Belleview Street. A detective checked police records to determine if there were any individuals previously contacted at that residence who matched the description of the shooter. He prepared a six-pack photographic lineup that included defendant's picture; defendant lived at that address. Detective Scott Murray prepared a second photographic lineup that included the picture of another "Flats" gang member known as "Chino."[3] R.A. did not identify anyone in either lineup.

Detective Murray and other officers went to defendant's home on August 21, 2008, to conduct a "knock-and-talk" with defendant concerning the nonfatal shooting of

---

[2] The probation report states that defendant is Hispanic; he was born in February 1990; and he is five feet three inches tall.

[3] Apparently more than one Flats member used the moniker "Chino."

4

Rueben Romero at 11:30 p.m. on April 30, 2008, and the shooting of R.A. and E.A. at 12:44 a.m. on May 1. Both shootings had taken place in the 1000 block of West Belleview Street, which was Verdugo Flats (Flats) gang territory. At the house, defendant told Detective Murray he had been at home at the time of both shootings. He denied gang membership but admitted he "hung out" with people in the Flats gang. He admitted he used the nicknames "Chino" and "Devil."

Detective Murray then obtained a search warrant for defendant's home. The search led to the seizure of weapons (although not the weapon used to shoot R.A. and E.A.) as well as evidence with gang writing on it and evidence showing that defendant went by the name "Chino." Defendant was arrested for weapons violations and was transported to the police department.

Defendant was interviewed after being advised of and waiving his *Miranda*[4] rights, and the interview was videotaped and played for the jury, which was also provided with a transcript. Defendant initially denied involvement with the Flats. After being confronted with evidence linking him to the gang, he conceded he "h[u]ng out with them" and "got their back." Defendant said he had the nicknames of "Chino," "Devil," and "Joe Joe."

Defendant stated that Romero was "like practically [his] best friend," and they were the heads of a tagging crew. Defendant believed Romero had been shot by someone

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

named "Angelo," who was associated with a Los Angeles gang. Defendant denied that Romero was affiliated with the Flats, although he had family from the Flats.

When Romero was shot, defendant had been in the bathroom at his house. He heard shots and screaming, and he ran over to Romero's house. On the way, a car sped past him. He had returned home when the second shooting occurred. He got dressed again and went back. He learned his friend Sandra Ramirez's brother, E.A., had been shot. He believed E.A. "had to be with some [kind of gang] because he looked like that." Defendant used to hang out with E.A., and E.A. had left his bicycle in defendant's back yard.

Defendant told Detective Murray, "There's a lot of people that would have wanted [E.A.]" because "he was from LA. He claimed Pomona something, something, something." Defendant said high-ranking members of the Flats gang gave him a Smith and Wesson "40" and told him to shoot E.A. to avenge the shooting of Romero; they would have killed him if he refused. On the night of the shooting, defendant was "looking for [E.A.]" and "was on his window" when E.A. arrived in a car. Defendant intended only to confront E.A. and ask him about Angelo. E.A. got out of the front passenger seat and started "walking all slow and he like[,] he acted weird, man." E.A. asked what defendant wanted, and defendant fired the gun about eight times. He drew a map showing where Vandusen's car had been and the route he took back to his home.

A gang expert testified that the Flats was an active gang that did not get along with Los Angeles-based gangs. The gang's primary activities were narcotics sales, firearm possession, stealing cars, and shootings. The expert testified to convictions of other Flats

6

members to establish a pattern of criminal gang activity. Based on a hypothetical mirroring the facts of the case, the expert stated his opinion that the crime had been committed for the benefit of the gang. In the expert's opinion, based, among other things, on defendant's own admission to the expert, defendant was a member of the Flats.

## A. Defense Evidence

Defendant testified in his own behalf. He and E.A. lived in the same neighborhood, and they had been friends since middle school. Defendant was also a close friend of E.A.'s sister. Defendant had several nicknames, including Chino, but it was not a gang name, and he did not belong to a gang, although he was acquainted with members of various gangs, including the Flats.

On the night of April 30, 2008, defendant had been at home when he heard gunshots and screaming from an apartment up the street. He went to investigate, and he saw Romero stumbling around. He helped Romero the floor and stayed in the area for about 15 minutes until a police officer told everyone to go home.

When defendant got back home, he awakened his cousin, Anthony Juarez, and told him about the shooting down the street. While they were talking they heard six to nine more gunshots. Juarez went back to sleep, but when defendant heard sirens pass, he walked down the street to investigate. He stood outside and watched as the police "raided" a nearby apartment and put two men into a squad car. He then went back home and went to bed. He denied any involvement in shooting E.A. and R.A.

On the day defendant's house was searched and he was arrested, he had smoked marijuana and crack and had taken prescription medications for depression. During the

7

questioning, he was concerned about the damage the police had caused to his grandmother's house, including broken windows. At first, he repeatedly denied any involvement in the shooting. After about an hour, he felt increasing pressure from Detective Murray's insistence that witnesses had seen defendant; there was no way he could defend himself in court; the situation was hopeless; and he would do life in prison. He also believed Detective Murray would exert pressure on his family if he did not say what the detective wanted to hear. He finally gave up and just agreed with the scenario Detective Murray suggested.

Juarez testified that defendant had awakened him the night of April 30, 2008, and told him about the shooting of Romero. While they were talking, Juarez heard a second set of five or six shots being fired. Juarez did not leave the house, and defendant stayed with him until he went back to sleep.

## B. Verdicts and Sentence

The jury found defendant guilty of two counts of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)) and found true multiple enhancements (§§ 12022.53, subds. (b)-(d), 186.22, subd. (b)(1)(C)) as to each count.

The trial court imposed a total term of imprisonment of 80 years to life, comprising a term of 15 years to life for each of counts 1 and 2, "due to true finding of gang allegation," and a consecutive term of 25 years for the gun use enhancement for each count under section 12022.53, subdivision (d). (Capitalization omitted.) The trial court suspended the terms for each of the additional enhancements.

8

## A.  Denial of Motion to Suppress Evidence

Defendant contends the trial court erred in denying his motions to suppress evidence and to quash and traverse the search warrant because the affidavit in support of the search warrant lacked sufficient information to support a conclusion that he had committed a crime or that evidence of the crime would be found at his residence.

### 1.  Additional Background

#### (a)  The search warrant affidavit

Detective Murray wrote the affidavit submitted in support of the request for a search warrant.  After describing his experience and training as a police officer, and specifically as a gang expert, he stated that E.A. and R.A. had each received several gunshot wounds from a .40-caliber semiautomatic handgun in the May 1, 2008, shooting at 1007 West Belleview Street.  E.A. had fled to Mexico.  R.A. said he could not identify the shooter, but he told the detective that E.A. had yelled, "[I]t was Chino from the [F]lats."  The shooting occurred in territory claimed by the Flats street gang.  R.A. said a Flats member had been shot earlier the same day, possibly by someone with ties to a Los Angeles-based street gang with which E.A. was associated, and R.A. believed a Flats member had shot him and E.A. in retaliation.

Detective Murray stated that on May 5, 2008, an anonymous male caller had reported the shooter had been a 16- or 17-year-old Hispanic male who lived at 1055 West Belleview Street, several houses away from the shooting.  On May 15, an anonymous female caller had said "Jo Jo," who was about 15 years old, was the shooter, and he had

9

run to 1055 West Belleview Street after the shooting. The caller said that on May 14, defendant had flashed a handgun and said, "these mother fuckers can't catch me."

A records check revealed that defendant lived at 1055 West Belleview Street and that his description matched that given by the anonymous callers. The detective prepared a six-pack photographic lineup including defendant's photograph. However, neither R.A. nor another witness was able to identify him; they explained they had not gotten a good look at the shooter because it had been dark out.

Detective Murray stated that on August 4, 2008, R.A. told him that "'people on the street who don't want to get involved'" had given him a photograph of defendant and had referred to him as "[Chino] from the Flats."

Detective Murray stated he believed it was common for witnesses in gang-related crimes to withhold their names, and anonymous informants in those situations were often accurate. Before requesting the search warrant, the detective went to 1055 West Belleview Street. No one came to the door for about 15 minutes, although the detective could hear people inside. Defendant eventually opened the back door and spoke to the detective. Defendant at first denied any involvement with the Flats gang but later admitted he was associated with the gang, and his moniker was "Chino." He admitted he knew E.A. At the residence, the detective saw several gang writings in plain view. He later learned that defendant was a good friend of the victim of the first shooting.

Detective Murray stated that based on his training and experience, he believed the delay in opening the door was because occupants were concealing illegal items such as firearms. He believed defendant was responsible for shooting E.A. and R.A., and a

10

search of his residence would yield evidence he possessed a firearm and had committed the attempted murder.

The magistrate issued a search warrant based on the affidavit.

(b)  Defendant's motions

Defendant moved to suppress evidence, including his confession, arguing the search warrant affidavit did not establish probable cause.  Defense counsel argued that the anonymous telephone calls were uncorroborated and were insufficient to support the issuance of the warrant.  The trial court denied the motion.

Defendant renewed his motion, and the trial court continued the hearing to permit defense counsel to obtain supporting declarations.  Defense counsel provided his own declaration that E.A. had told counsel he did not know who shot him; he had never said it was Chino of the Flats; and he did not know Chino of the Flats.  E.A. told defense counsel he and defendant were friends, and he would have recognized defendant if defendant had been the shooter.  E.A. said he would sign a declaration, and counsel prepared a declaration and delivered it to E.A.'s house.  However, when counsel returned, E.A.'s parents said E.A. was not at home.  At the continued hearing, the trial court denied the motion.

2.  *Standard of Review*

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.]  'The task of the issuing magistrate is simply to make a practical,

11

commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1040–1041 (*Kraft*).) "Whether an affidavit provided the magistrate '"substantial basis"' for concluding there was probable cause is an issue of law 'subject to our independent review.' [Citation.] But, because '[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause,' we accord deference to the magistrate's determination and '"doubtful or marginal"' cases are to be resolved with a preference for upholding a search under a warrant. [Citations.] Ultimately, 'the magistrate's determination will not be overturned unless the supporting affidavit fails as a matter of law to support the finding of probable cause. [Citations.]' [Citation.]" (*People v. French* (2011) 201 Cal.App.4th 1307, 1315, fn. omitted.)

3. *Analysis*

A search warrant may issue when the magistrate has a substantial basis for concluding that a "fair probability" exists that a search will "uncover wrongdoing." (*Kraft*, *supra*, at p. 1040.)

As noted above, the search warrant affidavit stated that R.A. told Detective Murray that E.A., the other victim of the shooting, had said immediately after being shot that "'it was Chino from the [F]lats.'" In *People v. Ramey* (1976) 16 Cal.3d 263, the court stated, "It may . . . be stated as a general proposition that private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt

12

upon their information, should be considered reliable. . . .  [N]either a previous demonstration of reliability nor subsequent corroboration is ordinarily necessary when witnesses to or victims of criminal activities report their observations in detail to the authorities."  (*Id*. at p. 269, fn. omitted; see also *Soli v. Superior Court* (1980) 103 Cal.App.3d 72, 82-83 (*Soli*) ["information from one reasonably believed to be the victim of a reported crime will be deemed reliable, thus furnishing Fourth Amendment probable cause for a search warrant"].)

Defendant contends *Soli* is distinguishable because in that case, the officers obtained information directly from the victim himself; whereas here, E.A.'s statement was provided by R.A., and E.A. was unavailable in Mexico.  Defendant's argument overlooks the fact that R.A. was also a victim of the shooting.

Although two separate anonymous callers reported the shooter lived at defendant's address, the search warrant affidavit did not rely solely on information from anonymous sources.  Detective Murray determined that defendant lived at the reported address, only a few houses away from E.A.'s house, and that defendant matched the description given by the anonymous callers.  The detective conducted a "knock and talk" visit to defendant's house, during which he independently confirmed that defendant had some connection to the Flats and that he used the nickname "Chino."  While at defendant's house, the detective observed several gang writings in plain view.  The detective further learned that defendant had been good friends with Romero, the victim in the earlier shooting, and that defendant knew E.A.  The shooting had occurred in Flats gang

13

territory. R.A. told the detective that E.A. was associated with the same Los Angeles-based gang believed to have been involved in the earlier shooting.

Based on all the information set forth in the search warrant affidavit, we conclude a "fair probability" existed that a search would "uncover wrongdoing." (*Kraft*, *supra*, 23 Cal.4th at p. 1040.) The trial court did not err in denying defendant's motions to suppress evidence.

## B. Voluntariness of Confession

Defendant contends his confession was involuntary, and its admission at trial violated his constitutional privilege against self-incrimination, his right to counsel, and his right to due process.

### 1. Additional Background

Defendant moved before trial to exclude his statement to Detective Murray on the ground it was involuntary. The trial court reviewed the unredacted videotape and transcript of defendant's interview. Detective Murray testified at the hearing on the motion. He had been assigned to investigate the shootings of E.A. and R.A. on May 1, 2008. On May 20, 2008, he learned E.A. had fled to Mexico. That same day, he spoke with R.A., who was still hospitalized. R.A. was unable to identify anyone in a photographic lineup that included defendant's photograph, and Detective Murray deemed the case inactive.

On August 4, 2008, R.A. telephoned Detective Murray to report that he had "received a photo from anonymous parties that were claiming that that was the individual that was responsible for the shooting . . . ." R.A. gave Detective Murray the photograph,

14

which was of defendant, and he said that at the time of the shooting E.A. had said "it was Chino from the Flats that had done the shooting." On August 21, Detective Murray went to defendant's residence at 1055 West Belleview to conduct a "knock-and-talk." When he arrived, no one answered his knock, although he could hear noises inside. After 10 or 15 minutes, someone finally answered the door. Detective Murray questioned defendant at the residence. Defendant denied he was a gang member but said he was associated with Flats gang members, and he went by the names of Joe Joe and Chino. Defendant said he knew both shooting victims; he and E.A. had been friends and had grown up together.

Detective Murray then obtained a search warrant for defendant's residence. During the search on August 27, 2008, the officers found weapons and gang paraphernalia, some of which had the moniker Chino written on it. Defendant was arrested, transported to the police station, and read his *Miranda* rights. Defendant agreed to talk to the detective.

During the interview, defendant asked Detective Murray why he would shoot E.A., and the following exchange occurred:

"[Detective Murray]: You can ask me all the questions in the world and I'll tell you why. Okay. The reason is . . . because [E.A.] was related with LA like [Angelo] was. And in order to get him—correct? Right?

"[Defendant]: Um-hum.

"[Detective Murray]: Am I right?

"[Defendant]: That could be it.

15

"[Detective Murray]: Okay. That sounds about right to me.

"[Defendant]: Yeah. It does."

Defendant continued to deny his involvement. Eventually, Detective Murray asked, "Why would you do something like that if you had this great plan [to continue his education] in the mix? Were you pressured to do it? That would be a logical explanation for me, man. If you were pressured to do it by some of the higher ups in the Flats. That would make a lot more sense to me: you know?" He continued, "But it would make sense and it would make sense to a jury and it would make sense to people saying, hey, listen, man. I was part of a gang at a time and if I wouldn't have done this—I'm not willing to give anybody up but if I wouldn't have done this, they would have killed me. I'm not saying it makes it okay or it makes it any less better [*sic*], but it gives them a reason, you know what I'm sayin'—" Defendant eventually stated he had been "pressured" to do the shooting.

At the hearing on the motion to suppress his confession, defendant testified he was 18 years old when he was interrogated. On August 27, 2008, he and Detective Murray had talked about where defendant had been during the shooting. The detective told defendant that shell casings had been found in the victims' front yard. When defendant waived his *Miranda* rights, he believed they were going to be talking about the guns found at his home.

The trial court found that defendant "was capable and did make a knowing, intelligent, and voluntary waiver of [his *Miranda*] rights." The trial court further found that "there was [no] coercive, unfair, overbearing conduct on the part of Detective

16

Murray. We're talking about an interview that lasted maybe a total of an hour to an hour and 20 minutes in which Detective Murray was the only officer involved in the questioning. Detective Murray was not so overbearing or intimidating that his mere presence alone was likely to intimidate [defendant] into making a false statement or one that was untrustworthy." The court found there had been no threats or promises of leniency. The court denied the motion to suppress the confession.

### 2. *Analysis*

"When a defendant challenges the admission of his or her statements on the ground they were involuntarily made, the prosecution must prove by a preponderance of the evidence the statements were, in fact, voluntary. [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Courts apply a totality of the circumstances test to determine the voluntariness of a confession. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "Among the factors to be considered are '"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."' [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*Ibid.*)

17

(a) Length, location, and continuity of interrogation

The interrogation was conducted at the San Bernardino Police Department. The trial court found that the interview lasted no more than an hour and 20 minutes, and Detective Murray was the only officer involved in the interrogation. Those facts support a determination that the confession was voluntary. (See, e.g., *People v. Carrington* (2009) 47 Cal.4th 145, 175 [under the totality of the circumstances, questioning that continued over eight hours did not render a confession involuntary].)

(b) Defendant's maturity, education, physical condition, and mental health

At the time of the interrogation, defendant was 18 years old, and he had gone to school through 11th grade. He was under the care of a therapist who was treating him for depression, and he was taking medication for his depression. Defendant was living with his grandmother, his aunt, and his cousins. The record does not indicate he had any physical limitations.

The trial court determined that defendant had the ability to relate to Detective Murray, understood his questions, and could communicate effectively. The court acknowledged defendant's youth and the fact that he had completed only 11th grade, but observed he "appeared to be intelligent in other ways what the Court would deem 'street smart.' He understood where he was. He understood that the police wanted to talk to him. He had the ability to comprehend the meaning and [e]ffect of making a statement."

We uphold the trial court's factual findings because they are supported by substantial evidence in the record. (*People v. Massie*, *supra*, 19 Cal.4th at p. 576.)

18

(c)  Implied threats of further harassment of defendant's family

Detective Murray told defendant he was sure they had the "right guy."  He stated, "[I]n order to protect your family to get the cops off your back, I think it's incumbent on you to just make peace with God, Bro.  Seriously, you got to make peace with it.  Because you['re] not gonna be able to run and hide forever."  Later, he stated, "You're a man and we gotta pay our dues and we have to respect our elders and our families.  Okay?  And you can't be bringing this heat down on your family any[]more."

At the hearing on the motion to suppress, defendant testified the police had broken windows at his grandmother's house during the search and had torn things up.  He believed that by confessing, it would all end.  However, he also testified that he did not think his family "would continue to suffer" "legal pursuit by law enforcement . . . ."

In *People v. Steger* (1976) 16 Cal.3d 539, the court stated:  "A threat by police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid.  [Citations.]  However, where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate an admission.  [Citations.]"  (*Id.* at p. 550.)  Here, we do not interpret Detective Murray's statement as an implied threat to punish defendant's relatives.  The fact that defendant believed his confession would benefit his family did not render his confession invalid.

(d)  Implied promises of leniency and threats of harsher punishment

Defendant contends Detective Murray told him he would spend the rest of his life in prison and then stated:  "I'm trying to give you an option here Bro.  I'm trying to give

19

you an option to come clean so the District Attorneys and us can work with you on this. Okay? Wherever [*sic*] you want to believe it or not, you know, your well being right now is in my best interest. 'Cause I want to fix this. I want to make it right, any you just need to try—you need to think about it. . . ." Defendant asserts that Detective Murray suggested "the very words of a hypothetical confession which could result in a shorter prison term" for defendant. He stated: "But it would make sense and it would make sense to a jury and it would make sense to people saying, hey, listen, man. I was part of a gang at a time and if I wouldn't have done this—I'm not willing to give anybody up but if I wouldn't have done this, they would have killed me. I'm not saying it makes it okay or it makes it any less better [*sic*], but it gives them a reason, you know what I'm sayin'—" The colloquy continued:

"[Detective Murray]: Does it sound more accurate, like what happened?

"[Defendant]: I don't know, man.

"[Detective Murray]: No you—Chino look at me Bro. You do know.

"[Defendant]: It's 'cause man seriously. Now I'm lost. Whatever happens right now. I'm in the box, right?

"[Detective Murray]: It all depends how long, though? Yeah. You're going to have to pay—

"[Defendant]: If that's gonna happen then—

"[Detective Murray]: —some dues. It does matter how long."

"A promise to an accused that he will enjoy leniency should he confess obviously implicates the voluntariness of any resulting confession. [Citation.]" (*People v. Boyette*

20

(2002) 29 Cal.4th 381, 412.) Here, however, Detective Murray made no express or implicit promise of leniency or threat of harsher punishment. Moreover, at the hearing on the motion to suppress, defendant testified he confessed because Detective Murray promised he would serve only 10 years if he did so. No such promise appears in the videotape of the interview. Because defendant expressly testified he confessed because of that purported explicit promise, there is no credible evidence in the record that any implied promise of leniency or threat of harsher punishment induced the confession.

(e)  Untrue statements about the evidence

Defendant argues that Detective Murray untruthfully insisted that "'good, solid witnesses'" would testify that they had seen defendant running from the shooting scene with a gun and it would look bad if he continued to deny his involvement. In fact, E.A. told R.A. that Chino from the Flats had been the shooter, and one of defendant's nicknames was Chino. Thus, the detective's statement was not entirely false. Moreover, although "police deception is a factor to be taken into consideration in determining the voluntariness of a confession" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1241), "the police properly may confront, and even debate with, a suspect regarding theories based on the circumstances of the crimes and even debate with the suspect the merits of those theories. [Citation.]" (*People v. Carrington*, *supra*, 47 Cal.4th at p. 175; see also *People v. Williams* (2010) 49 Cal.4th 405, 444 [suggesting possible explanations for how a crime occurred is a permissible interrogation tactic].)

Moreover, telling a defendant it would look better if he admitted the crime is also a permissible technique: "[T]here is nothing improper in pointing out that a jury

21

probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials." (*People v. Williams*, *supra*, 49 Cal.4th at p. 444.)

Detective Murray's statements that there were witnesses and that it would look better if defendant admitted the crime were not coercive and not "'''''"reasonably likely to procure an untrue statement."'''''" (*People v. Tate* (2010) 49 Cal.4th 635, 684.)

### (f) Conclusion

Based on the totality of the circumstances, we agree with the trial court that defendant's confession was voluntary.

## C. Punishment

Defendant contends the sentence of 80 years to life constituted cruel and unusual punishment.

### 1. Additional Background

Defendant was 18 years old when he committed the shooting. He had no known prior criminal record, although he admitted a weapons offense as a juvenile.

### 2. Forfeiture

The People contend defendant failed to object to his sentence on the basis it was cruel and unusual punishment, and he has therefore forfeited his challenge. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993 (*Russell*).) We will nonetheless exercise our discretion to reach the merits of the issue.

### 3. Analysis

"A sentence violates the federal Constitution if it is 'grossly disproportionate' to the severity of the crime. [Citations.]" (*Russell*, *supra*, 187 Cal.App.4th at p. 993.) "A

sentence violates the state prohibition against cruel and unusual punishment [citation] if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience.'" [Citations.]" (*Ibid.*) State courts evaluate three factors to determine whether a particular punishment meets that standard. First, they evaluate the nature of the offense and the offender with regard to the degree of danger they present to society. Second, they compare the punishment imposed to punishments prescribed by California law for more serious offenses. Third, they compare the punishment imposed with punishments prescribed by other jurisdictions for the same type of offense. (*In re Lynch* (1972) 8 Cal.3d 410, 425-429 (*Lynch*), superseded by statute on another ground by *People v. Caddick* (1984) 160 Cal.App.3d 46, 51.)

Defendant limits his argument to the first *Lynch* factor with emphasis on the nature of the offender. He notes that he was only 18 when he committed the offense; he had no prior criminal record; and it is unlikely his sentence will be served in his lifetime. In *People v. Caballero* (2012) 55 Cal.4th 262, our Supreme Court held that sentencing a juvenile who commits a nonhomicide offense to a de facto sentence of life without parole is categorically cruel and unusual punishment. (*Id.* at p. 268.) *Caballero* is distinguishable because defendant here was not a juvenile when he committed his crimes. In *People v. Argeta* (2012) 210 Cal.App.4th 1478, the court rejected the argument of an 18-year-old defendant that the holding of *Cabellero* should be extended to his case. The court explained, "[W]hile '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.]

23

Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood.  Such arguments would have no logical end, and so a line must be drawn at some point.  We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes  . . . ." (*Argeta*, *supra*, at p. 1482.) We agree with the reasoning of the court in *Argeta*; we conclude defendant's sentence was not categorically cruel and unusual punishment.

We next examine the sentence in light of the seriousness of the offense. Attempted premeditated and deliberate murder is indisputably among the most serious of offenses, and defendant committed the offense against two separate victims.  Moreover, his personal discharge of a firearm causing great bodily injury and the fact that the offenses were committed for the benefit of a criminal street gang made the offenses even more egregious.  "'It was [defendant's] conduct, not his sentence, that was cruel and unusual.' [Citation.]" (*People v. Leon* (2010) 181 Cal.App.4th 452, 469.)

Defendant does not address the second and third *Lynch* factors—punishments imposed in this jurisdiction for other serious crimes and punishments imposed in other jurisdictions for similar offenses.  He has therefore failed to meet his burden of establishing that the punishment was cruel and unusual in light of those factors.  (*People v. King* (1993) 16 Cal.App.4th 567, 572.)

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST  
Acting P. J.

We concur:

MCKINSTER  
J.

MILLER  
J.